UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

No. 91-4472
_____

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

CHARLES G. STEPHENS, SR.,
Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Louisiana
_____

(June 19, 1992)

Before BROWN, GARWOOD and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Charles G. Stephens, Sr. was charged with one count of conspiracy to violate the Hobbs Act in violation of 18 U.S.C. § 1951, and four counts of substantive violations of the Hobbs Act. On appeal, Stephens argues that there is insufficient evidence to support his conviction under the Hobbs Act, that the district court abused its discretion in admitting coconspirator hearsay testimony at trial, that the prosecution did not timely disclose tapes which contained exculpatory evidence, and that the district court abused its discretion in admitting evidence from his employer. Finding no error, we affirm.

Stephens was indicted on August 15, 1989 and charged with one count of conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951,[1] and four counts of substantive violations.[2] After a jury trial, Stephens was found guilty on all counts. He unsuccessfully moved for a judgment of acquittal and for a new trial.[3]

From 1982 through 1988, Stephens was employed by Guillory Bonding Company as a bail bondsman in the Vernon Parish area of Louisiana. He was also a town alderman in New Llano, Louisiana from June 1986 through May 1988. According to the Indictment, Stephens conspired with members of the New Llano police department to extort money from travelers passing through the town, in exchange for the dismissal or reduction of driving while intoxicated ("DWI") or operating under the influence ("OWI") charges, the return of the travelers' driver's licenses and the release of their vehicles from impoundment, and obtaining bond

---

[1] The Hobbs Act provides in pertinent part:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

[2] Stephens' alleged coconspirators were the Chief of Police of New Llano, Louisiana, Flynn Kay, and three of his officers-- Tommy Sermons, Matthew Freeman and Roy Bartmess, Jr. Assistant Chief of Police Elmo Roberts was also an alleged coconspirator. These coconspirators were not indicted.

[3] The district court sentenced Stephens on May 23, 1991 to three years imprisonment on each of the five counts to run concurrently. He was not assessed a fine or restitution, but was required to pay a $250.00 special assessment.

without being jailed.[4]  This conspiracy centered around the New Llano police department's traffic stops--the New Llano Chief of Police required each police officer to make at least sixty stops a month resulting in arrest for DWI or OWI.

The stops occurred mainly on six-tenths of a one-mile stretch of Highway 171, which runs through the town of New Llano.  Local residents were rarely stopped--truck drivers, transients and military personnel were stopped most often.  After the individuals were stopped, they were given a field sobriety test.  If the individual failed the test, he was arrested for DWI/OWI and other traffic offenses.

When the vehicles were towed, they were almost always towed by B & B Towing.  Other towing companies were allowed little

---

[4]  Specifically, Count 1 of the indictment, dealing with a conspiracy of the Hobbs Act, 18 U.S.C. § 1951, alleges:

> CHARLES G. STEPHENS, Sr., . . . and others . . . did knowingly, willfully and unlawfully conspire to commit extortion . . . in that . . . STEPHENS . . . (exercising authority and control over the actions of members of the New Llano Police Department), and others known and unknown . . . did wrongfully use their positions, defendant as a town Alderman, the co-conspirators as members of the New Llano Police Department, to unlawfully obtain, attempt to obtain, and cause to be obtained in connection with and in consideration for dismissal or reduction of DWI/OWI charges, towing contracts, returning of drivers' licenses, release of vehicles from impoundment and obtaining of bond without being jailed, payment of money not due to them or their office . . . from two owners of B & B Towing Company and approximately 72 individuals charged with DWI/OWI offenses, with their consent, said consent being induced under color of official right.

opportunity to tow such vehicles. For every vehicle that B & B Towing towed, it made a "kickback" of $10.00 to the New Llano Chief of Police.[5] Once at the police station, most of the individuals arrested had only the option of using Stephens of Guillory Bonding Company to make bond arrangements. They were "booked" and remained in the jail until bond arrangements were completed. B & B Towing did not release any of the individuals' cars until Stephens notified Bill Metlin, one of the owners of B & B Towing, that Stephens had been paid for his bail bonding services.

The individuals apparently would pay the amount requested by Stephens, and then they were permitted to leave. The standard fee charged was $150.00 for three offenses.[6] The total of the bonds for three offenses was usually $1,000.00 ($500.00 for the DWI/OWI, and $250.00 per other offense). The Government established that each surety bond was represented by a power of attorney. The New Llano Chief of Police required a separate power of attorney on each offense, resulting in a total fee of $150.00 for the three bonds. Stephens, however, did not adhere to this policy, but usually only attached one power of attorney aggregating all three offenses, which meant that he should have only charged ten percent--$100.00-- of the total bond. Stephens would not account for this cash, or report less than the amount he actually received.

---

[5] The indictment alleges that this amount was later increased to $15.00.

[6] These three offenses included: driving while intoxicated or operating while intoxicated and either speeding, improper lane usage or failure to obey a signal light.

Stephens argues that his convictions for conspiracy to commit extortion in violation of the Hobbs Act, as well as his convictions for the substantive convictions under the Hobbs Act, were not supported by sufficient evidence. In reviewing a challenge to the sufficiency of the evidence in a criminal case, it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *See United States v. Hall*, 845 F.2d 1281, 1283 (5th Cir.), *cert. denied*, 488 U.S. 860, 109 S. Ct. 155 (1988) (quotation omitted). We "review the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in favor of the verdict." *United States v. Evans*, 941 F.2d 267, 271-72 (5th Cir.), *cert. denied*, _U.S._, 112 S. Ct. 451 (1991) (citation omitted).

**A.**

Stephens was convicted of Count 1 of the indictment, which alleged a conspiracy to commit extortion in violation of the Hobbs Act.[7] After trial, Stephens filed a "Motion For Judgment of Acquittal and in the Alternative For A New Trial", alleging insufficiency of the evidence to sustain the conspiracy conviction.

---

[7] *See supra* note 4.

On appeal, he argues that the district court incorrectly denied this motion.[8]

To convict for criminal conspiracy under 18 U.S.C. § 1951, the jury must find an agreement between two or more persons to commit a crime, and an overt act by one of the conspirators to further the conspiracy. *See United States v. Villarreal*, 764 F.2d 1048, 1051 (5th Cir.) (citations omitted), *cert. denied*, 474 U.S. 904, 106 S. Ct. 272 (1985); *see also United States v. Stodola*, 953 F.2d 266, 270 (7th Cir. 1992) (conspiracy to commit extortion involves knowingly joining a combination or confederation of two or more persons formed for the purpose of committing extortion by their joint efforts) (citation omitted), *petition for cert. filed* (Apr. 6, 1992). "Proof of a conspiracy does not require direct evidence of an actual agreement between the co-conspirators, but may be inferred from circumstantial evidence." *United States v. Wright*, 797 F.2d 245, 253 (5th Cir.) (citation omitted), *reh'g denied*, 804 F.2d 843 (5th Cir. 1986), *cert. denied*, 481 U.S. 1013, 107 S. Ct. 1887 (1987); *see United States v. Di Carlantonio*, 870 F.2d 1058, 1061-62 (6th Cir.) (question is whether a reasonable jury could have found defendants conspired to extort money from individuals,

---

[8] We apply the same standard of review to a challenge to a denial of a post-verdict judgment of acquittal, claiming insufficiency of evidence, as we do to claims of insufficiency of evidence to support a conviction--we determine whether a reasonable trier of fact could have found that the evidence establishes the defendant's guilt beyond a reasonable doubt. *See United States v. Cardenas*, 748 F.2d 1015, 1019 (5th Cir. 1984) (when reviewing post-verdict judgment of acquittal based on sufficiency of evidence, we determine whether a reasonable trier of fact could have found that the evidence establishes guilt beyond a reasonable doubt), *appeal after remand*, 778 F.2d 1127 (5th Cir. 1985).

and whether, if successful, this scheme would have affected commerce by depleting the assets of an enterprise in interstate commerce), *cert. denied*, 493 U.S. 933, 110 S. Ct. 323 (1989).

The evidence is this case amply indicates the existence of a conspiracy. The New Llano Chief of Police had his officers make a minimum of sixty stops per month for DWI/OWI offenses and other traffic violations. B & B Towing did the majority of the towing of these vehicles, despite the existence of other local towing companies and a local ordinance that required the rotation of wrecker services. For being allowed to do the towing, B & B Wrecking Service paid the New Llano Chief of Police $10.00 per vehicle, which was later increased to $15.00 per vehicle.

Stephens was good friends with the New Llano Chief of Police. When the New Llano Chief of Police was not in the office, the police officers were told to contact Stephens if they had any problems. When one of the individuals was in jail for a traffic offense, Stephens was almost always used as the bondsman. For each person bonded by Stephens, a charge was made which exceeded the amount Stephens reported to his employer, Guillory Bonding Company. A reasonable trier of fact could find from the circumstantial evidence that the New Llano Chief of Police and Stephens split the unreported amount of money in some manner. In addition, Stephens knew that B & B Towing was paying money to the Chief of Police and, when B & B Towing collected bond money for Stephens, Stephens' secretary would come and pick it up.

Stephens does not deny the existence of the conspiracy so much as he argues that he was not a part of it and had no knowledge of it. Specifically, he claims that he was not a participant in the conspiracy between the Chief of Police and the B & B Towing, and he contends that he did nothing wrong by collecting the money for bond services. We disagree because the totality of the circumstances involving Stephens indicates a common plan and purpose. *See United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.) (participation in a criminal conspiracy may be inferred from a development and a collocation of circumstances) (citation omitted), *cert. denied sub. nom.*, 444 U.S. 846, 100 S. Ct. 91 (1979), *cert. denied sub. nom.*, 440 U.S. 962, 99 S. Ct. 1508 (1979). Construing the evidence in the light most favorable to the Government, we find that the evidence is sufficient to support the jury's finding of a conspiracy between Stephens and members of the New Llano police department.

**B.**

Stephens argues that the Government failed to establish that the conspiracy and acts of extortion affected interstate commerce. He contends that the payment of kickbacks between the towing company and the New Llano Chief of Police did not have any effect on interstate commerce, and that a tenuous connection exists between the payment of bonds for release from jail in New Llano, Louisiana and interstate commerce.

"By statutory definition, in order for the extortion to constitute a federal crime under the Hobbs Act, some connection

-8-

must be established between the extortionate conduct itself and interstate commerce." *United States v. Wright*, 797 F.2d 245, 248 (5th Cir.), *reh'g denied*, 804 F.2d 843 (5th Cir. 1986), *cert. denied*, 481 U.S. 1013, 107 S. Ct. 1887 (1987), *citing* 18 U.S.C. § 1951(a).[9] The interstate commerce connection is determined on a case-by-case basis. *Id.* The impact on interstate commerce need not be substantial to meet the statutory requirement; all that is required is that commerce be affected by the extortion. *Id.* at 248-49; *see also Wright*, 804 F.2d at 844 (5th Cir. 1986) (Hobbs Act requires only minimal impact on interstate commerce) (citations omitted); *United States v. Villarreal*, 764 F.2d 1048, 1052 (5th Cir.) (Hobbs Act only requires a minimal interference with interstate commerce) (citation omitted), *cert. denied*, 474 U.S. 904, 106 S. Ct. 272 (1985).

Stephens' arguments are unconvincing. The highway on which the cars were stopped and towed was six-tenths of a mile of U.S.

---

[9] 18 U.S.C. § 1951 provides in pertinent part:
   (b) As used in this section-

* * *

   (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

Highway 171, a major four-lane highway that runs north and south through the western corridor of Louisiana. This highway provides access to other highways that lead to Texas if one travels west, and to Arkansas if one travels north. Testimony introduced at trial indicates that most of the people who were stopped and had their cars towed were not local residents, but individuals travelling to other states. Accordingly, we find Stephens' argument that interstate commerce was not affected to be without merit.

## C.

Stephens contends his convictions for the substantive violations under the Hobbs Act were not supported by sufficient evidence. To establish an offense under the Hobbs Act, the Government must prove beyond a reasonable doubt that: (1) that the defendant induced a person to part with property; (2) the defendant acted knowingly and willfully by means of extortion; and (3) that the extortionate transaction delayed, interrupted, or adversely affected interstate commerce. *See United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir.), *later proceeding*, 946 F.2d 1125 (5th Cir. 1991), *cert. denied*,_U.S._, 112 S. Ct. 380 (1991); *see also* 18 U.S.C. § 1951. "[E]xtortion under color of official right means the wrongful taking by a public officer of money or property not due to the officer or the office." *Snyder*, 930 F.2d at 1093; *see also United States v. Wright*, 797 F.2d 245, 250 (5th Cir.) ("A conviction under the Hobbs Act may be sustained by a finding that a public official has taken a fee, unlawfully, under color of his

-10-

public office, in return for performance or nonperformance of an official act.") *reh'g denied*, 804 F.2d 843 (5th Cir. 1986), *cert. denied*, 481 U.S. 1013, 107 S. Ct. 1887 (1987). "There is no requirement that threat, force, or duress be proved when the defendant is a public officer." *Wright*, 797 F.2d at 250 (citation omitted). "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States*, No. 90-6105, 1992 WL 107339 at *6 (U.S. May 26, 1992).

## 1.

Stephens contests his conviction on Count II of the indictment[10] on the grounds that Adams never had any knowledge of Stephens' official capacity as a New Llano town alderman. Furthermore, Stephens argues that he did not indicate that he could have Adams' driver's license returned to him until after Adams agreed to make a payment.

Adams' testimony, however, indicates that Stephens indicated to him that, through his contacts, Stephens would get Adams'

---

[10] Count II states:
[O]n or about July 17, 1986 . . . STEPHENS . . . did knowingly, willfully and unlawfully commit extortion, which extortion obstructed, delayed and affected interstate commerce . . . in that . . . STEPHENS . . . did unlawfully seek, ask, solicit and receive a cash payment of . . .($1,140.00). . . from Richard A. Adams, which was not due . . . STEPHENS . . . or his office, with the consent of Richard A. Adams, said consent being obtained and induced through wrongful use of fear of economic loss and under color of official right . . . to prevent prosecution of Adams on a charge of Driving While Intoxicated . . . .

-11-

charges reduced or dismissed if Stephens was paid $1,040.00.[11] Whether or not Adams knew what Stephens' official position was, Adams believed that Stephens had the power to fix Adams' ticket. Thus, Stephens was acting under color of official right and committed extortion. *See United States v. Dozier*, 672 F.2d 531, 539-40 (5th Cir.) (noting *Mazzei* court finding that payments to defendants induced by exploitation of lessor's reasonable belief that defendant's position as state senator provided him with control over state leases, and holding that defendant had induced such belief from victims) (citation omitted), *cert. denied*, 459 U.S. 943, 103 S. Ct. 256 (1982); *Dozier*, 672 F.2d at 542 (victim's fearful state of mind is a crucial element in proving extortion; state-of-mind evidence is admissible in a trial for extortion under color of official right even though proof of direct coercion is not

---

[11] Adams testified:
> A. . . . [W]e met in the motel parking lot where I was staying and he explained the situation or the offer that he could make to me, basically, that he had a lawyer that wasn't cheap, but would cost me six hundred dollars for the lawyer, but this lawyer had some kind of connections where the charges would be reduced.

Record on Appeal, vol. 7, at 1085-1086, *United States of America v. Charles G. Stephens, Sr.*, No. 91-4472 (5th Cir. filed Sept. 16, 1991) ["Record on Appeal"] (direct examination of Adams); *id.* at 1112 (cross examination of Adams):
> A. What he told me is that if I turned the money over to him that through whatever arrangements he had, that the charges would be reduced, and I would get my license returned. And then, therefore, I would not be required to come back for a court appearance.

Adams paid Stephens the $1,040.00, and Stephens returned Adams' drivers' license to him. Adams, however, was not prosecuted for his traffic offenses, nor do the records of the Leesville clerk of the court indicate the charges were ever pursued. *See also* Government Exhibit 2-5, *included in* Record on Appeal (Clerk of Court, City of Leesville notation indicating no paperwork ever received from New Llano on Richard A. Adams).

required) (citations omitted); *United States v. Rabbitt*, 583 F.2d 1014, 1027 (8th Cir. 1978) ("The official need not control the function in question if the extorted party possesses a reasonable belief in the official's powers.") (citations omitted), *cert. denied*, 439 U.S. 1116, 99 S. Ct. 1022 (1979); *United States v. Hall*, 536 F.2d 313, 320 (10th Cir.) (extortion under color of official right exists if power to determine issue is within scope of accused's office and victim has a reasonable belief that he does have power), *cert. denied sub nom.*, 429 U.S. 919, 97 S. Ct. 313 (1976); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir. 1974) (so long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951), *cert. denied sub nom.*, 421 U.S. 910, 95 S. Ct. 1561-62 (1975); *United States v. Mazzei*, 521 F.2d 639, 645 (3d Cir. 1975) (state legislator violates Hobbs Act when payments to defendant induced by exploitation of victim's reasonable belief that defendant's position as state senator provided him with effective control over state leases), *cert. denied*, 423 U.S. 1014, 96 S. Ct. 446 (1975).

### 2.

Stephens contests his conviction on Count III of the Indictment,[12] asserting that Hill did not bargain for anything which

---

[12]  Count III of the Indictment charges:
> [O]n . . . July 3, 1987 . . . STEPHENS . . . did knowingly, willfully and unlawfully commit extortion, which extortion obstructed, delayed and affected interstate commerce . . . in that . . . STEPHENS . . . did unlawfully seek, ask, solicit and receive a cash payment of . . .

would result in having her charges reduced or dismissed.  Stephens argues that Hill thought she was paying the money as a fine for her OWI offense.  In the alternative, Stephens argues that the payment was nothing more than a cash bond.  Stephens also asserts that Hill did not believe Stephens was acting under color of official right.

We do not agree with Stephens.  As the parties agree, Hill's testimony at trial does indeed indicate some inconsistencies and confusion regarding the exact purpose of the money she paid to Stephens.  But rather than indicating that the transaction was on the "up and up" as Stephens asserts, Hill's testimony indicates that she was unfamiliar with the court system and the purpose of and procedure for obtaining bonds.  Contrary to Stephens' assertions, the record indicates that Hill paid the money to Stephens because she thought Stephens could take care of the charges against her.  That is why she paid Stephens the money-- because of his "good relationship" with the police department and because he could "take care" of Hill's problems.[13]  Such actions

> ($500.00) . . . from Debra Irene Hill, which was not due . . . STEPHENS . . . or his office, with the consent of Debra Irene Hill, said consent being obtained and induced through wrongful use of fear of economic loss and under color of official right, in that said . . . ($500.00) . . . was given by Debra Irene Hill in order to have the charge of Driving While Intoxicated and Illegal Lane Change reduced and/or dismissed when she appeared in Court . . . .

[13]  Consider the following excerpts from Hill's testimony:
Q.  What happened when Mr. Stephens showed up? Did you talk to him about your bond and so on?
A.  Yes, sir.  He told me that his fee was fifty dollars per charge, and then I began

-14-

indicate Hill paid Stephens the money because of his public office. *See United States v. Williams*, 621 F.2d 123, 125-26 (5th Cir. 1980) (payor testified that, if defendant had not been a school board member, he would not have given defendant $4,000), *cert. denied*, 450 U.S. 919, 101 S. Ct. 1366 (1981), *appeal after remand*, 679 F.2d 504 (5th Cir. 1982), *cert. denied*, 459 U.S. 1111, 103 S. Ct. 742 (1983). Thus, we find a reasonable trier of fact could find beyond a reasonable doubt that Stephens extorted money from Hill under color of official right.[14]

---

> talking to him about the situation about me leaving town, and asked if there was any way that this could be kept off my military record and maybe charged to my post address. And he said he would see what he could do, because he had a good relationship going with the police department.
> Q. Okay. And did you have a hundred dollars to give him?
> A. Yes, sir.

Record on Appeal, vol. 8, at 1284-85 (direct examination of Hill); *id.* at 1314 (re-direct examination of Hill):

> Q. Now, Mr. Stephens also told you . . . he told you he was going to take care of it, or get the receipt, or whatever, is that correct?
> A. That's correct.
> * * *
> A. I asked him about the court date after he gave me the receipt for the five hundred dollars cash that I had given him. And that's when he told me don't worry about it, it was taken care of.

[14] *See also* Government's Exhibit 4, *included in* Record on Appeal (Guillory Bonding Company records for 12/29/86-8/28/87 in which Stephens did not report the $500.00 he received from Hill after her 7/2/87 OWI offense) and Government's Exhibit 1-11, *included in* Record on Appeal (New Llano Police Department Booking book listing Hill's 7/2/87 offense).

**3.**

Stephens contests his conviction on Count IV of the Indictment,[15] arguing that neither Metlin or James P. Bigley, the other owner of B & B Towing, were induced to hold vehicles until bonds were paid to Stephens.  Stephens also contends that Count IV of the indictment alleges events taking place in 1984, and that because he was not an alderman until 1986, he was not acting under color of official right.

---

[15]  Count IV incorporates by reference paragraphs A.1. through A.8. of the Indictment.  Count 1, paragraph A.7. states:B & B Towing was a company which, among other things, was in the business of operating a wrecker service located in Leesville, Louisiana. From the latter part of 1984 until approximately May, 1986, and from February, 1987, until approximately December, 1987, B & B Towing exercised almost exclusive rights to two and impound the vehicles of persons arrested for DWI/OWI charges in the town of New Llano.

Count IV continues:

> At a date unknown to the Grand Jury but sometime during the latter part of 1984 . . . STEPHENS . . . did knowingly, willfully and unlawfully commit extortion . . . in that . . . STEPHENS . . . did unlawfully seek, demand, ask, solicit and receive a promise and assurance from William Metlin, owner and operator of B & B that William Metlin would not release impounded vehicles in his care and custody until such time as the owners of said vehicles paid . . . STEPHENS . . . money that . . . STEPHENS had charged those individuals in regard to bonds, which promise and assurance was not due to . . . STEPHENS . . . or his office, with the consent of . . . Metlin, said consent being obtained and induced through wrongful use of fear of economic loss and under color of official right, in that said promise and assurance was given by . . . Metlin in order to continue towing vehicles for the town of New Llano . . . . .

-16-

Stephens misreads Count IV.[16] Count IV specifically incorporates paragraphs A.1 through A.8 of Count I, and alleges: (1) In *the latter part of 1984*, Stephens solicited Metlin's promise not to release impounded vehicles in his care until such time as the owners of the vehicles paid Stephens' charge in regards to bail bonds (Count IV); 2) from *the latter part of 1984* until May 1986 and from February 1987[17] until December of 1987, B & B Towing exercised exclusive rights to tow and impound vehicles of individuals arrested for DWI/OWI charges in the town of New Llano (Count I, paragraph A.7); 3) Metlin's consent--obtained and induced through wrongful use of fear of economic loss and under the color of official right--was given in order to *continue* towing vehicles for the town of New Llano (Count IV); and 4) between June 30, 1986, until approximately April 24, 1988, Stephens served as an elected alderman for the town of New Llano, Louisiana.

---

[16] The four substantive counts (along with the one conspiracy count) reveal a two-prong scheme to extort money; that is, Stephens and Kay not only extorted money from drivers but, concomitantly, extorted money from B & B Towing.

Counts II, III and V are examples of the first prong of the extortion scheme--extortion of the drivers. In Count II, the indictment alleges that on July 17, 1986, Stephens extorted $1,140 from Richard A. Adams under the color of official right. Count III alleges that on July 3, 1987, Stephens extorted $500 from Deborah Irene Hill under the color of official right. Count V alleges that on December 28, 1986, Stephens extorted $1,000 from Thomas D. Cupit, Jr., under the color of official right.

Although Count II, III and V focus on the first prong of this extortion scheme--that is, the extortion of drivers on Highway 171--this scheme would not have been successful but for the second prong of the scheme--that is, the extortion of Metlin and B & B Towing, which is the focus of Count IV.

[17] In August 1986, James P. Bigley took over Metlin's business, and ran it until February 1987, at which time Metlin took over his business again.

An indictment must be a "plain, concise and definite written statement of the essential facts constituting the offense charged" to satisfy Rule 7(c) of the Federal Rules of Criminal Procedure, and this court has held that:

> an indictment is sufficient if it [1] contains the elements of the offense charged and [2] fairly informs a defendant of the charge against him[,] and [3] enables him to plead acquittal or conviction in bar of future prosecutions for the same offense.

*United States v. Hagmann*, 950 F.2d 175, 183 (5th Cir. 1991), *quoting United States v. Stanley*, 765 F.2d 1224, 1239 (5th Cir. 1985). Clearly, Count IV charges that Stephens' extortion of B & B--although initiated in the latter part of 1984 when B & B obtained exclusive rights to tow and impound vehicles for the town of New Llano--continued and was legally consummated for the purpose of 18 U.S.C. § 1951 during the period of 1986 through 1987 when Stephens served as an alderman.

And this is exactly what the Government proved. Stephens knew that Metlin was paying money to the New Llano Chief of Police, and he knew that Metlin would not release vehicles that had been towed until he had Stephens' approval, which was given after the person whose car was towed had paid Stephens.[18] Metlin knew that Stephens

---

[18] Metlin testified as follows:
Q. And did there come a time when you confirmed [to Stephens] that you were paying [money to the Chief of Police]?
A. Yes, sir.
Q. Do you recall approximately when that was?
A. It would have been April or May, Sir?
[Q.] Of which year?
A. '87.
Record on Appeal, vol. 4, at 264-65 (direct examination of Metlin); *id.* at 267-68.

and the Chief of Police were "real good friends" and Metlin believed that Stephens could stop him from towing cars. A reasonable trier of fact could find that, because Metlin was afraid that he would not get any towing business if he did not, Metlin paid the money to the Chief of Police and collected money for the bond payment to Stephens;[19] Metlin may also have believed that some

---

* * *

A. . . . we were told to hold vehicles, we just marked hold on the bill.

Q. . . . . And who were you told by to hold the vehicles?

A. By the bonding service, Mr. Stephens.

Q. And do some of those documents reflect, at the bottom, that you indeed had collected money for Mr. Stephens?

A. Yes, sir.

Q. And when you collected the money for Mr. Stephens, what did you do?

A. The majority of times, his secretary would come and pick it up.

Q. If you can recall, sir, were you allowed to release vehicles to anyone if their bond was not paid to Mr. Stephens?

A. If they hadn't paid their bond and a hold had been put on the vehicle, and if they came to pick it up, I would call the bonds office, and if they had paid the bond to the lady there or Mr. Stephens would say go ahead and release it.

A. . . . . Did you ever have occasion to release a vehicle without an individual's bond being paid, after you had been told to hold it?

A. No, sir.

[19] *See United States v. Westmoreland*, 841 F.2d 572, 581 (5th Cir.) (there is no requirement that threat, force, or duress be proved when the defendant is a public officer) (citation omitted), *cert. denied*, 488 U.S. 820, 109 S. Ct. 62 (1988); *United States v. Pattan*, 931 F.2d 1035, 1039-40 (5th Cir. 1991) (requisite element of extortion conveyed by jury instructions that required a showing that the public officer knowingly took advantage of his office in relation to the payor in order to obtain the consensual transfer of property), *petition for cert. filed* (July 29, 1991).

of the money he was paying to the Chief of Police was for Stephens. Furthermore, Metlin could believe that Stephens might stop him from getting towing business from the town, so Metlin acceded to Stephens' demands not to release the vehicles until Stephens was paid.[20]

Although Stephens may contend that Count IV of the Indictment may not be the most clearly drafted, Stephens was afforded the protection of his rights at trial. *Cf. United States v. Hagmann*, 950 F.2d 175, 183-85 (5th Cir. 1991), *petition for cert. filed* (Apr. 28, 1992) (Count V of indictment failed to allege an overt act subsequent to act of travel, but missing element was charged in other counts and reindictment and retrial would not afford defendant any protection of his rights not afforded in first

---

[20] Stephens appears to be arguing that he did not extort "property" from Metlin within the meaning of the Hobbs Act. The extorted property set forth in the indictment is Metlin's promise and assurance not to release impounded vehicles in his care until the vehicles' drivers had paid Stephens. If the promise was not made, Metlin had the fear of losing the towing business from the town.

The concept of property under the Hobbs Act has not been limited to physical or tangible things; the right to make business decisions and to solicit business free from wrongful coercion is a protected property right. *See United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980) (victim's right to solicit business free from threatened destruction and physical harm falls within the scope of protected property rights under Hobbs Act) (citations omitted), *cert. denied sub nom.*, 450 U.S. 916, 101 S. Ct. 1359 (1981); *United States v. Santoni*, 585 F.2d 667, 672-73 (4th Cir. 1978)(property extorted was the right of victim to make a business decision free from outside pressure wrongfully imposed), *cert. denied*, 440 U.S. 910, 99 S. Ct. 1221 (1979) ; *United States v. Nadaline*, 471 F.2d 340, 344 (5th Cir.) (extortion involved concerned business accounts and unrealized profits from those accounts; such intangible property is included within rights protected by Hobbs Act) (citation omitted), *cert. denied*, 411 U.S. 951, 93 S. Ct. 1924 (1973)

-20-

trial); *United States v. Alexander*, 850 F.2d 1500, 1504 (11th Cir. 1988) (any variance between dates alleged and dates proved will not trigger reversal as long as the date proved falls within the statute of limitations and before the return date of the indictment) (quoting *United States v. Harrell*, 737 F.2d 971, 981 (11th Cir. 1984), *cert. denied*, 496 U.S. 1164, 470 U.S. 1027, 105 S. Ct. 923 (1985)) (citation omitted), *reinstated in part by* 888 F.2d 777 (11th Cir. 1989), *cert. denied*, __U.S.__, 110 S. Ct. 2623 (1990).

**4.**

Stephens contests his conviction on Count V of the Indictment,[21] asserting that the evidence does not show that he acted under color of official right, and that the evidence does not show that the payment was made to prevent prosecution of a DWI charge.

Again, Stephens mischaracterizes the evidence. The evidence shows that Cupit was stopped on a DWI/OWI charge, and, after paying Stephens $150.00 for bond, Cupit paid Stephens another $1,000.00. Cupit testified that the $1,000.00 was paid to Stephens to "take

---

[21] Count V of the Indictment alleges:
[O]n . . . December 28, 1986 . . . STEPHENS . . . did knowingly, willfully and unlawfully commit extortion . . . in that . . . STEPHENS . . . did unlawfully seek, ask, solicit and receive a cash payment of . . . ($1,000) . . . from Thomas D. Cupit, Jr., which was not due . . . STEPHENS . . . or his office, with the consent of Thomas D. Cupit, Jr., said consent being obtained and induced through wrongful use of fear or economic loss and under color of official right . . . .

care" of these charges.[22] Cupit asked for reassurance that nothing would happen to him, and Stephens said he did not "have to worry about nothing." Cupit understood that the $1,000 he paid to Stephens would "wipe everything clean like it never happened." Stephens then reassured Cupit that Stephens' "friend" would take care of Cupit's problem.

In addition, the records from Guillory Bonding Company for this period show that Stephens did not report the money.[23] Cupit was not prosecuted on these charges, and the records from the clerk of the court of the City of Leesville indicate that no paperwork

---

[22] In particular, Cupit testified:
  Q. [D]o you recall explaining to Mr. Stephens that you were concerned about the OWI/DWI ticket?
  A. Yes, sir.
  Q. Was that because of your past record?
  A. Yes, sir.
  Q. And what did Mr. Stephens tell you, sir?
  A. He said that he could help me out if I [gave] him a thousand dollars, that this could be taken care of.
Record on Appeal, vol. 6, at 982-83 (direct examination of Thomas D. Cupit, Jr.); *id.* at 985:
  Q. And did you give him the thousand dollars . . .?
  A. Yes, sir, I did.
                    * * *
  Q. Did you get [your driver's license] back?
  A. Yes, sir.
  Q. When?
  A. Charlie [gave the driver's license] back to me.
  Q. When?
  A. When he tore up the ticket.

[23] *See* Government's Exhibit 4, *included in* Record on Appeal (records of Guillory Bonding Company from 10/16/85-1/12/87 and from 12/29/86-8/28/87).

was received on Cupit.[24]  Thus, we conclude that a reasonable trier of fact could find beyond a reasonable doubt that Stephens extorted money from Cupit under color of official right.[25]

### III

Stephens argues that the district court erred in admitting into evidence, over his objections, hearsay statements of his alleged coconspirators.[26]  Stephens asserts that insufficient evidence was submitted with respect to his involvement in the conspiracy, and that the statements were improperly admitted pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence.[27] According to Stephens, a conspiracy did not exist and the admitted statements[28] were not made in the course of any conspiracy.

The district court's determination that a statement was made in furtherance of a conspiracy is a finding of fact, which will be

---

[24] *See* Government's Exhibit 2-32, *included in* Record on Appeal (noting that no paper work received by the Leesville clerk of court's office regarding Thomas D. Cupit, Jr.).

[25] *See Williams*, 621 F.2d at 124 (5th Cir. 1980) ("The language `under color of official right,' is consonant with the common law definition of extortion, which could be committed only by a public official taking a fee under color of his office, with no proof of threat, force or duress required.") (citations omitted).

[26] *See supra* note 2.

[27] Rule 801(d)(2)(E) states:
    A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

[28] Stephens does not point to any specific statements made by alleged coconspirators.  Rather, he appears to contest the admission of any statements these coconspirators made.

-23-

reversed only if clearly erroneous. *See United States v. Snyder*, 930 F.2d 1090, 1095 (5th Cir.) (citations omitted), *later proceeding*, 946 F.2d 1125 (5th Cir. 1991), *cert. denied*, _U.S._, 112 S. Ct. 380 (1991). The phrase "in furtherance of the conspiracy" is not to be applied strictly. *Id*. This court has "shunned an overly literal interpretation of this phrase." *United States v. Ascarrunz*, 838 F.2d 759, 763 (5th Cir. 1988) (citation omitted).

Our review of the record compels our conclusion that the district court's conclusion was not clearly erroneous. The record supports the finding that the New Llano Chief of Police, as well as other members of the department, were involved in the conspiracy to extort money.[29] The admission of the coconspirators' statements was appropriate, and the district court did not err in concluding that such statements were made during the course of the conspiracy and in furtherance of the conspiracy.

## IV

Stephens also contends that the district court erred in denying his motion for a new trial, because the Government's untimely failure to apprise him of taped conversations deprived him of a fair trial. During discovery, Stephens requested copies of any recording, wiretap or other electronic eavesdropping information concerning him.[30] The Government responded that it had

---

[29] *See supra* Part II.A. and accompanying text.

[30] *See* Record on Appeal, vol. 2, at 27 (Stephens' Motion for Discovery and Inspection pursuant to Rule 16 of the Federal Rules of Criminal Procedure).

one tape recording concerning Stephens and that it would give him a copy of this tape.[31] As it turns out, other tape recordings existed, and the tape recordings apparently were conversations between Stephens and Sergeant Bruce Beamer. The Mayo-Flynn tapes were not played to the jury until late in the first week of trial, and the Beamer-Stephens tapes were never played to the jury. The Mayo-Flynn tape recordings were made available to Stephens before trial, but he did not make a copy--Stephens was notified about the Beamer-Stephens tape recordings the weekend before the trial began.

Stephens argues that he did not have adequate time to review the tapes and that, because of his learning of the tapes so late he was unable to subpoena and secure Sergeant Beamer's presence at trial. He asserts that his line of defense was predicated on the theory that he had no involvement in the charged conspiracy, and the late offering and revelation of the tapes undermined his defense and deprived him of a fair trial, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

The Government agrees that the second set of tape recordings was not disclosed in the most timely manner. Stephens apparently knew of the tape involving the New Llano Chief of Police during the discovery stage, but did not know of the tape between Beamer and himself until the weekend before the trial began. The Government

---

[31]   This tape contained conversations between the New Llano Chief of Police, Flynn Kay, and Gregory F. Mayo (an alleged victim of extortion).

-25-

asserts, however, that, given the overwhelming evidence of Stephens' guilt, the tapes were of no great significance.[32]

Stephens appeals that part of the denial of his Rule 33 motion for a new trial based upon the allegation that the Government suppressed evidence in violation of *Brady*. *Brady* applies to situations involving "`the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.'" *United States v. Snoddy*, 862 F.2d 1154, 1156 (5th Cir. 1989) (citation omitted). A *Brady* claim involves three elements: (1) the prosecution's suppression or withholding of evidence; (2) which evidence is favorable, and (3) material to the defense. *United States v. McKinney*, 758 F.2d 1036, 1049 (5th Cir. 1985) (citation omitted). The evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

We disagree that a *Brady* violation occurred in this case. Stephens had copies of the tapes at trial, and he was given time to listen to them after jury selection and before the trial began. The inquiry is whether Stephens was prejudiced by a tardy disclosure--if he received the material in time to put it to

---

[32] The Government also argues that the tapes were not suppressed, that the tapes were not material to guilt or punishment, and that Stephens failed to establish that the outcome of the case would have been different had the tapes been furnished earlier. Furthermore, the Government notes that Stephens has not shown how the tapes were exculpatory.

effective use at trial, his conviction will not be reversed simply because the material was not disclosed as early as it might have, or should have, been--such that the fairness of the trial was impugned. *See McKinney*, 758 F.2d at 1050 (citations omitted). Stephens was aware of the tapes' contents at the trial, and he has not shown that he failed to receive the tapes in time to put them to effective use. Given this knowledge, we do not find a *Brady* violation. *Cf. United States v. Wicker*, 933 F.2d 284, 292-93 (5th Cir.), *cert. denied*, _U.S._, 112 S. Ct. 419 (1991) (Wicker made no specific request for witness fee information and he knew that Government was paying for at least a portion of witness's expenses during trial, thus no *Brady* violation occurred). We do not suggest that evidence which is either inculpatory or disclosed during trial may be the proper subject of a *Brady* claim.

V

Lastly, Stephens argues that the district court incorrectly admitted evidence[33] regarding his relationship with Guillory Bonding Company. Stephens contends that the evidence of his relationship with Guillory Bonding Company was "very prejudicial" and irrelevant to the charges in the Indictment. He argues that such evidence confused the issues and misled the jury. The Government counters

---

[33] Stephens questions the admissibility of witness testimony regarding his relationship with Guillory Bonding Company (*see, e.g.,* Record on Appeal, vol. 5, at 485-87 [testimony of Mr. Allen K. Millaway, alleged extortion victim] and Record on Appeal, vol. 9, at 1717-28 [testimony of Ms. Annette Leonard, former employee of Guillory Bonding Company]) and the admission of weekly reports from Guillory Bonding Company (*see* Government's Exhibit 4, *included in* Record on Appeal).

that the evidence was relevant to showing Stephens' intent regarding those individuals he bonded out of jail, and that the reports from Guillory Bonding Company were relevant to show that Stephens failed to account for all the money he received in payment for bonds.

Rule 403 of the Federal Rules of Evidence states that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." The district court has broad discretion in this matter, which is reviewable only for abuse. *See United States v. Blake*, 941 F.2d 334, 340 (5th Cir. 1991) (citations omitted). As this court has noted, relevant evidence is inherently prejudicial, but only unfair prejudice, which substantially outweighs probative value, permits the exclusion of relevant matter under Rule 403. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S. Ct. 128 (1979). Rule 403's major function is limited to excluding evidence of scant or cumulative probative force, introduced for the sake of its prejudicial effect. *Id.* Rule 403 is not designed to allow the court to "even out" the weight of evidence or to mitigate a crime. *Id.*

The Indictment alleges a conspiracy against Stephens and four substantive counts of extortion. Such evidence as the testimony of Annette Leonard and the weekly reports of Guillory Bonding Company show that Stephens received money from various individuals and that he did not accurately report the amounts. Such testimony and

exhibits were relevant to ascertaining Stephens' role in the conspiracy and his extortionate acts against the individuals.  We conclude, therefore, that the evidence was relevant and that the district court did not err in admitting it.

## VI

For the foregoing reasons, we AFFIRM.