Revised February 27, 2003

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 01-40105

_____

United States of America
                                    Plaintiff-Appellee,

versus

Jose Marcelino Rubio, Sr., a.k.a. "Pinchino";
Gregorio Jesus Castaneda
                                    Defendants-Appellants,

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

February 7, 2003

Before DAVIS, BENAVIDES, DENNIS, Circuit Judges

W. EUGENE DAVIS, Circuit Judge

    Appellants, Jose Marcelino Rubio, Sr. ("Rubio") and Gregorio Jesus Castaneda ("Castaneda")

a/k/a Jesse Castaneda, appeal their convictions for extortion and conspiracy to commit extortion

under 18 U.S.C. §§ 2 and 1951 (the "Hobbs Act") on numerous grounds. For the reasons that

follow, we affirm.

I.

    The government produced evidence tending to show that between July 1992 and 1999 Rubio

and Castaneda participated in a scheme to assist numerous arrestees in Webb County, Texas to obtain

1

favorable dispositions of their cases in return for money. The crimes for which these individuals were arrested varied and included charges for narcotics violations, driving while intoxicated ("DWI"), unlawful carrying of a weapon, unauthorized use of a vehicle, and credit card abuse. Certain jailers in Webb County informed many of these arrestees of local bail bondsmen who could help them dispose of their cases. These bondsmen knew certain Assistant District Attorneys ("ADAs") in the Webb County District Attorney's Office ("DA's Office") and/or their investigators who were willing to reduce charges or dismiss cases in return for money. The bondsman would set a fee for fixing the case, take money from the arrestee, give the ADA or investigator his cut, and pocket the rest.

Castaneda and Rubio had different roles in this scheme. Castaneda was a bail bondsman who owned Century Bail Bonds. Castaneda used his connections with both investigators and ADAs to help his clients secure favorable dispositions of their cases. With the help of two investigators, Agustin Mendoza ("Mendoza") and Juan Alfonso Rodriguez ("Rodriguez"), and others in the DA's Office, Castaneda secured reduced charges, probationary sentences, pretrial diversion, and recovered seized vehicles for his clients. For this assistance, Castaneda's clients gave him thousands of dollars and other valuables, portions of which were shared with the officials.

Rubio used a number of techniques to extract money from persons after their arrests. He was the father of Joe Rubio, Jr., the Webb County District Attorney, and used this position to convince arrestees that he was able to help them dispose of their cases. At all times during the course of this scheme, he also held positions in Webb County. Rubio was the director of the Webb County Detention Center from 1985 through 1993 and in this capacity carried a badge issued by the Sheriff's Department which he sometimes flashed in a show of authority to arrestees. In 1994, Rubio was commissioned as an investigator for the Zapata County District Attorney's Office and remained in

this position until 1999.

Rubio independently approached arrestees with promises that, in return for cash, he and his friends could help them avoid jail time. Rubio's nephew, Jose Juan Rubio ("Juan Rubio"), and Rubio's son, Carlos Manuel Rubio ("Carlos Rubio"), also referred arrestees to Rubio for assistance. Rubio worked with ADAs, Ernesto Cavazos ("Cavazos") and Ramon Amado Villafranca ("Villafranca"), and investigators, Rodriguez, Mendoza, and Domingo Noe Dimas ("Dimas"), to obtain prosecutorial concessions for the arrestees from whom he had accepted payments. Rubio paid these ADAs and investigators a cut of the money he collected from the arrestees.

In May 2001, Rubio and Castaneda were charged in a second superceding indictment with conspiracy and substantive counts of obstructing, delaying and affecting commerce through extortion in violation of the Hobbs Act. Cavazos, Villafranca, Mendoza, Rodriguez, Dimas, Juan Rubio, and Carlos Rubio were also charged in this same indictment. Rubio, Castaneda, Mendoza, and Rodriguez were tried jointly. Rubio was convicted on the conspiracy count and six of the substantive counts.[1] Castaneda was convicted of all crimes with which he was charged.

In this appeal, Rubio and Castaneda challenge their convictions on a number of grounds: (1) that the district court constructively amended the indictment to charge Rubio as a public official, (2) that the district court erred in instructing the jury that a jailer is a public official under the Hobbs Act, (3) that the district court abused its discretion in limiting counsel's closing arguments, (4) that the crimes for which Rubio and Castaneda are convicted are not within the reach of the commerce clause and that the district court improperly charged the jury with regard to their crimes' effect on

---

[1] Mendoza and Rodriguez were also convicted; however, at the time this appeal was lodged, they had not been sentenced for their crimes. Accordingly, they have not joined Rubio and Castaneda in this appeal.

commerce, (5) that the district court abused its discretion in allowing certain expert testimony, (6) that the district court abused it discretion in failing to grant Castaneda's Motion to sever his trial, and finally (7) that there is insufficient evidence from which to convict either Rubio or Castaneda. We address each of the appellants' arguments in turn.

II.

Rubio first argues that the district court constructively amended the indictment with regard to the substantive counts against him by instructing the jury that jailers, due to their status as peace officers, are public officials under the Hobbs Act. "A constructive amendment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged." United States v. Holley, 23 F.3d 902, 912 (5th Cir. 1994)(internal quotation and citation omitted). A constructive amendment violates the defendant's right under the Fifth Amendment to a grand jury indictment.

Even if the district court constructively amended the indictment by instructing the jury that a jailer could be considered a public official for purposes of the Hobbs Act, Rubio did not object to the charge and concedes that a plain error analysis applies. Under Rule 52(b) of the Federal Rules of Criminal Procedure, this court may correct the error only if it is both "plain" and it "affects substantial rights." United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770,1777 (1993). However, even if these conditions are satisfied, we need only correct a forfeited error that seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 736.

Under the Hobbs Act, one of the elements of extortion is that property be obtained from

4

another "under the color of official right."[2]  In order to prove t his element, the government must prove that a public official obtained payment to which he was not entitled.  United States v. Stephens, 964 F.2d 424, 429 (5th Cir. 1992).  When a defendant holds an office, it is not necessary that the person from whom the money was taken be aware of the extortionist's official position as long as the victim believes that the individual had the power to carry out the threat or promise made to the victim.  Id.  Moreover, a person who holds himself out as a public official is also acting "under the color of official right" even though he actually holds no official position.  Thus, in order to convict Rubio of extortion under the Hobbs Act, the government had to show that he was a public official, that he held himself out as a public official, or that he paid a public official to fix the arrestees' cases.

Rubio contends that the indictment charged that he acted in a private capacity rather than an official capacity.  Rubio assert s that the language of the indictment shows that the government presented the case to the grand jury on an aiding and abetting theory, relying on the fact that Rubio paid cert ain ADAs and/or their investigators to meet the "color of official right" element.  Rubio argues that because the government could not prove that any ADA or investigator was ever paid, the government changed its theory of the case to assert that Rubio was himself an "official" acting "under the color of official right" so as to meet that element of the offense.

The government argues that the charge did not expand the indictment.  Count 1, which

---

[2]  The Hobbs Act reads in pertinent part as follows:
(a) whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery, extortion or attempt or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both.
(b) As used in this section --
        (2) The term "extortion" means the obtaining of property from another, with his consent, . . . *under the color of official right.* (Emphasis ours).

5

charges all of the defendants with conspiracy, describes the capacity in which each defendant acted in that conspiracy. Count 1 describes Rubio as the father of the DA and a former Webb County deputy sheriff; it does not assert that he was also an investigator for the DA's office in Zapata County or a jailer during the period in which the conspiracy and substantive offenses were alleged to have taken place.[3] Rubio argues that the substantive counts refer back to this description of his role even though there is no direct reference to it.

Counts 3, 7, 8, 9, 10 and 18, (the "Substantive Counts" of conviction) charging Rubio and others of actually affecting commerce through extortion do not allege the roles of the defendants. However, the Substantive Counts at issue in this appeal, such as Count 3, state that the persons charged were acting both as principals and accomplices; that they aided and abetted each other and also make references to a "*respective office*" held by these defendants.[4] The reference to an office

---

[3] Paragraph 1 of Count 1 reads:

1. **Jose Marcelino Rubio, Sr.,** was a resident of Laredo, Texas. He used his influence, as the father of the Webb County District Attorney and as a former Webb County deputy sheriff, to provide and attempt to provide dispositions of criminal cases in Webb County in exchange for money.

[4] Count 3 reads:

From in or about June 1997 through July 1997, in the Southern District of Texas ad elsewhere, and within the jurisdiction of this Court Defendants,

JOSE MARCELINO RUBIO, SR. and AUGUSTIN MENDOZA,

each aiding and abetting the other did knowingly, willfully and unlawfully attempt to and did obstruct, delay and affect commerce as that term is defined in Title 18, United States Code, Section 1951 (b) (3), by means of extortion in that the defendants did obtain and attempt to obtain payments of money that were not due to them or their respective office and to which they nor their respective office was entitled, in that they received approximately $1,500 to provide or attempt to provide a disposition of a Driving While Intoxicated case (hereinafter to as D.W.I.) From a criminal defendant whose consent was induced under the color of official right. In

6

suggests that Rubio held an official position, without specifying any particular position. Because of these references, the district court was entitled to read the indictment as alleging that Rubio held an "office." To establish Rubio's guilt on the conspiracy count, the government was required to establish that one of the conspirators acted under color of his office. United States v. Box, 50 F.3d 345, 351 (5th Cir. 1995). The action of the ADAs and investigators in reducing or dismissing charges was the central "official" action that allowed the scheme to succeed. It is therefore understandable that the government did not allege other official action in the conspiracy count. Instructing the petit jury regarding Rubio's various offices would not constitute an amendment or expansion of the indictment. Rubio's argument therefore must fail.

III.

In a related argument, Rubio contends that the trial court erred in instructing the jury that a jailer is a public official for purposes of the Hobbs Act. Rubio failed to object to this charge. Accordingly, our review is limited to plain error. United States v. Jimenez, 256 F.3d 330 (5th Cir. 2001).

Rubio argues that a jailer is not considered a peace officer under Texas statutory law and, thus, is not a public official for purposes of the Hobbs Act. However, the Hobbs Act preserved the common law definition of extortion. United States v. Tomblin, 46 F.3d 1369, 1383 (5th Cir. 1995); Evans v. United States, 504 U.S. 255, 259, 112 S. Ct. 1881, 1885 (1992). Thus, the district court

---

violation of Sections 1951 and 2.

With the exception of details of dates, accomplices, monetary amounts received, and charges fixed, the language used in the other Substantive Counts for which Rubio was convicted is identical to this language.

was not limited exclusively to those individuals recognized as peace officers under Texas statutory law but, instead, could charge the jury consistent with a common law definition of public official. At common law, jailers have been long recognized as public officials subject to extortion laws.[5] Therefore, the district court committed no error, plain or otherwise, by instructing the jury that a jailer is a public official for the purposes of the Hobbs Act.

## IV.

Rubio argues next that the court erroneously limited his closing argument by precluding him from arguing that the government was required to prove that any payments the arrestees made were made because of the public office the recipient held.

Our review of the record reveals that the court did not limit counsel's argument in this respect. Counsel was permitted to argue that Rubio was not a public official and no one believed he was a public official, even when he showed his badge. He argued that it was not enough for someone to accept money to do what a layman could do; they had to corrupt the office. Counsel never informed the court of an argument he wanted to make but could not make because of the court's instructions. Moreover, Rubio does not explain to us what arguments the district court prevented him from making. This argument is meritless.

## V.

Both Rubio and Castaneda challenge the district court's ruling that, as applied to their cases, the Hobbs Act is within Congress's power to regulate commerce. Applied constitutional challenges

---

[5] See James Lindgren, Article: The Elusive Distinction between Bribery and Extortion: From the Common Law to the Hobbs Act, 35 UCLA L. Rev. 815 (1988)(detailing the history of common law of extortion) (cited with approval by this court in United States v. Tomblin, 46 F.3d 1369, 1383).

are reviewed *de novo*. United States v. Jennings, 195 F.3d 795, 800 (5th Cir. 1999) Rubio and Castaneda also argue that there was insufficient evidence of a relationship to commerce to support their convictions under the Hobbs Act. This issue is reviewed for sufficiency of the evidence. United States v. Villafranca, 260 F.3d 374 (5th Cir. 2001).[6] Because the sufficiency challenge is subsumed by the constitutional challenge, we examine them together. Id.

Rubio and Cast aneda argue specifically that, in light of the Supreme Court's opinions in United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, (1995); Jones v. United States, 529 U.S. 848, 120 S. Ct. 1904 (2000); and United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740 (2000), prosecutors can not aggregate charged conduct with like conduct and thereby prove that an activity has a substantial affect on commerce. Appellants assert that the charged conduct had no substantial effect on interstate commerce and that the Hobbs Act as applied to their cases is, therefore, unconstitutional.

With regard to most of the challenged counts against the defendants, our recent opinion in United States v. Villafranca controls. In United States v. Villafranca, we addressed the commerce clause challenges of Ramon Villafranca another defendant charged with Rubio and Castaneda.[7] As

---

[6] In a related argument, Castaneda challenges the jury charge regarding his conduct's affect on commerce. In the challenged charge, the district court instructed the jury on what activities constitute interstate and foreign commerce. The court then charged that the defendant's conduct need not substantially affect interstate or foreign commerce as long as the conduct would substantially affect interstate or foreign commerce if repeated many times over. We have approved of this language on a number of occasions. United States v. Jennings, 195 F.3d 795, 800; United States v. Robinson, 119 F.3d 1205 (5th Cir. 1997), *cert. denied,* 522 U.S. 1139, 118 S.Ct. 1104, 140 L.Ed.2d 158 (1998); United States v. Miles, 122 F.3d 235, 241 (5th Cir. 1997). Thus, Castaneda's argument is foreclosed by circuit precedent.

[7] Though Villafranca was charged in the same indictment, he was tried separately from Castaneda and Rubio.

in this case, Villafranca took bribes to fix cases for a number of arrestees facing drug charges. We held that interfering with or facilitating drug trafficking is sufficient to create an affect on interstate commerce because drugs are traded on the international market. United States v. Villafranca, 260 F.3d 374, 378.

In the present case, most of the counts involve extorting money to fix drug trafficking charges. One of the counts charged that Rubio extorted money to fix a charge of credit card abuse. This count also involved extorting money to fix a charge of unauthorized use of a vehicle which was used by the arrestee to cross the United States border into Mexico and return with methadone. Under United States v. Villafranca, the government established a sufficient nexus to commerce in these counts to overcome appellants' constitutional challenge and the Hobbs Act sufficiency challenge.

While the vast majority of the counts against Rubio and Castaneda are controlled by Villafranca, others involve the extortion of money to provide favorable dispositions of DWI offenses. In United States v. Wright, 797 F.2d 245 (5th Cir. 1986), this court found that the requisite nexus to commerce existed where extortion charges under the Hobbs Act involved failure to prosecute drunk drivers. In United States v. Wright, the court relied on expert testimony that non-enforcement of DWI laws results in more alcohol related accidents and less highway safety to support its conclusion that the extortion affected interstate commerce.

In this case, as in Wright, the government's expert testified that drinking and driving is likely the major factor in highway accidents. He stated that the high risks can be reduced by treating the drinking driver or by suspending or revoking driving privileges but that failure to prosecute drunk drivers encourages more drunk driving and jeopardizes highway safety.

Though United States v. Wright was issued prior to the Supreme Court's opinions in Lopez,

10

Jones, and Morrison, we agree with the Eleventh Circuit's post-Lopez decision in United States v. Castleberry, 116 F.3d 1384 (11th Cir. 1997), that there is a sufficient nexus to commerce to permit jurisdiction under the Hobbs Act.

Based on the forgoing, we are satisfied that as applied to each of the counts against Rubio and Castaneda the Hobbs Act does not exceed Congress's power to regulate commerce.

VI.

Castaneda also challenges the admission of the expert testimony of Dr. Robert Voz, regarding the effect of weak prosecution or non-prosecution of DWIs on interstate commerce on the basis that the testimony was unreliable and irrelevant under Daubert v. Merrel-Dow Pharms., 509 U.S. 579 (1993) and, alternatively, that it was unfairly prejudicial under Federal Rule of Evidence 403. The substance of Castaneda's argument is that Dr. Voz was not qualified to testify regarding the impact of drunk driving on commerce and had not conducted any studies to show whether his nationwide findings regarding DWI prosecutions hold true in Texas. We review challenges of a district court's rulings on the admissibility of evidence for an abuse of discretion. United States v. Norris, 217 F.3d 262 (5th Cir. 2000).

The government produced substantial evidence of Dr. Voz's expertise on the subject of DWIs. Among his many qualifications, he is the head research scientist at the Pacific Institute, a nonprofit organization of scientists working on government funded research in areas such as public health, alcoholism, alcohol problems, and traffic safety. He has been employed with the Pacific Institute as a researcher fo r twenty years. Since 1982, his area of research has been drinking and driving. During his tenure with the Pacific Institute, Dr. Voz participated in studies related to the impact of failure to prosecute DWIs on law enforcement, on drivers, and on the public in general.

11

Some of these studies have been published in journals; others are published by the government. Prior to entering the private sector, Dr. Voz worked for the Department of Transportation, National Highway Safety Administration, for thirteen years evaluating laws and federal programs relating to drinking and driving.

Based on these qualifications, the district court did not abuse its discretion in concluding that Dr. Voz was qualified to testify regarding the effect of low prosecutions of DWI cases on highway safety and commerce.

Castaneda also asserts that Dr. Voz's testimony was not reliable or relevant because it was based on tests conducted on a nationwide basis. Dr. Voz's research showed that when people perceive that, if arrested, they will be prosecuted and convicted for DWI, it is a general deterrent, lowering the number of people who will engage in drinking and driving. When no action is taken by law enforcement to prosecute offenders, the cycle of drinking and driving continues. Dr. Voz testified that lowered rates of prosecution of DWI cases results in more alcohol-related crashes, less highway safety, less travel, and increased traffic congestion. This testimony is relevant to the government's theory that the extortion in this case affected interstate commerce. The defendant's counsel vigorously cross examined Dr. Voz regarding his studies and their application to DWIs in Webb County, and the district court did not abuse its discretion in accepting Dr. Voz's explanation of the reliability and relevance of his tests to this case. Thus, Dr. Voz's testimony was properly admitted as reliable and relevant under Daubert v. Merrel-Dow Pharms.

We also conclude that the district court did not abuse its discretion in concluding that Dr. Voz's testimony was neither unfairly prejudicial nor confusing. Thus, Castaneda's Rule 403 challenge likewise has no merit.

12

Based on the forgoing, the district court did not abuse its discretion in admitting the testimony of Dr. Voz.

## VII.

Castaneda also contends that the district court erred in denying his motion for severance because the complexity of the case was likely to cause jury confusion. This challenge is reviewed for an abuse of discretion. United States v. Lee, 744 F.2d 1124 (5th Cir. 1984). In order to meet this burden, "[a] defendant must show 'specific and compelling prejudice against which the district court could not provide adequate protection, and that this prejudice resulted in an unfair trial.'" United States v. Sharpe, 193 F.3d 852, 862 (5th Cir. 1999) (citing United States v. Mitchell, 31 F.3d 271, 276 (5th Cir. 1994)).

Castaneda asserts that the failure to sever his case resulted in jury confusion regarding what evidence was applicable to each count and to each defendant. However, the district court gave careful instructions throughout the trial, informing the jury that particular items of evidence did not necessarily implicate all defendants. In its final instruction, the court explicitly instructed the jury that they had to consider the evidence as it applied to each defendant. We are satisfied that the instructions given by the district court in this case were sufficient to cure any possible prejudice to Castaneda.

Based on the foregoing, the district court did not abuse its discretion in denying Castaneda's Motion for Severance.

## VIII.

Finally, both Rubio and Castaneda contend that the evidence was insufficient to prove that a public official was ever paid for the favorable disposition of a criminal case. In reviewing

13

sufficiency claims, we "must determine 'whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Williams, 264 F.3d 561, 576 (5th Cir. 2001)(citations omitted). The "jury is 'free to chose among all reasonable constructions of the evidence,' and 'it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" Id. Our "review is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." Id.

As noted in Section II above, an element of extortion "under color of official right" is that a public official "took money or something of value not due him or his office for the performance or non-performance of an official function." United States v. Millet, 123 F.3d 268, 274 (5th Cir. 1997). As in proof of any fact, the payment to a public official may be established by either direct or circumstantial evidence. United States v. Stephens, 964 F.2d 424, 428.

A.

The government charged Rubio with using his influence both as a public official and as the father of the Webb County DA to extort money to fix criminal cases. For each count in the indictment, the government produced evidence showing that an arrestee paid money to Rubio. Thus, in the counts where Rubio extorted money as a public official,[8] the Hobbs Act's requirement that a public official is paid is satisfied. In other counts, the government produced evidence that Rubio either flashed a badge or otherwise held himself out as a public official.[9] In most of the counts, Rubio

---

[8] Counts 3, 7, 8, 9, 10, 18 charge Rubio with receiving a payment as a public official.

[9] The government supported Counts 3, 9 and 18 with evidence that Rubio flashed a badge or referred to himself as "the law."

14

also paid a public official such as an ADA or investigator.[10] Our review of this record satisfies us that the government presented sufficient evidence to establish this element in all counts.

B.

Castaneda was charged only as a bail bondsman. As such, he acted exclusively in a private capacity. For each Count on which he was convicted, the government was required to prove that he acted in concert with a public official who received payment of a portion of the money Castaneda extorted from an arrestee. Our review of the record satisfied us that the government produced sufficient evidence to permit a jury to find that an official received some of the money Castaneda extorted from his clients for each count of his conviction.

The most direct evidence the government produced was from the testimony of a government cooperating witness, Jesse Salas. Salas recounted numerous statements Castaneda made, describing payments he made to public officials to fix cases for his bail customers.[11] The government also produced documentary evidence tying Castaneda to particular ADAs and investigators who disposed of many of the cases Castaneda was paid to fix.[12] For each case Castaneda aided in fixing, the government produced evidence that he received a payment in addition to his bond fee and that the

---

[10] The government supported Counts 1, 10, and 18 with evidence showing that Rubio told people that he had to share a portion of the money extorted from the arrestees with different ADAs or investigators.

[11] The government supported Counts 1 and 11 with evidence showing that Castaneda told Salas that he had to share a portion of the money extorted from the arrestees involved with different DA's or investigators.

[12] The government produced Rodriguez's and Mendoza's day-planners containing notations regarding the arrests relating to Counts 1, 12 and 17. With regard to Counts 1, 2, 17 and 19, the government produced disposition memos and lists prepare by Castaneda's staff directing public officials as to how the cases were to be disposed.

15

arrestee's case was disposed of in an unusually lenient manner considering the charges, consistently resulting in no jail time for the arrestee. Based on this evidence, we are satisfied that the government presented sufficient evidence to establish this element in all counts.

IX.

For the reasons stated above, Rubio's and Castaneda's convictions on all counts are AFFIRMED.