United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 2, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 04-20600

———————————————

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

CLEMIS LARAINE JACKSON, MD; WESLEY ALFORD BOYD, JR

Defendants - Appellants

———————————————————————————————————————

Appeals from the United States District Court
for the Southern District of Texas, Houston
No. 4:02-CR-120-3

———————————————————————————————————————

Before KING, GARZA, and OWEN, Circuit Judges.

KING, Circuit Judge:[*]

Defendants-appellants Clemis Laraine Jackson, M.D. and Wesley Alford Boyd, Jr. appeal their convictions and sentences resulting from their involvement in physical-therapy clinics that fraudulently billed Medicare and Medicaid. For the reasons that follow, we affirm Jackson's convictions and sentence. We also affirm Boyd's convictions for conspiracy and payment of illegal remunerations (kickbacks). But concluding that the government presented insufficient evidence, we reverse Boyd's conviction for

———————————

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

health-care fraud, and we vacate his sentence and remand for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case centers around two Houston, Texas, physical-therapy clinics that engaged in fraudulent billing of Medicare and Medicaid. The first of the clinics, Quality Medi-Care Health Care Clinic, Inc. ("Quality"), was opened and operated by Henry Lewis Reece, Jr. and Mark Anthony Broussard. Quality was open from about 1996 to 1998. Initially, Quality's business consisted primarily of automobile-accident victims. At some point, however, Broussard brought his friend, defendant-appellant Wesley Alford Boyd, Jr., to meet with Reece, and Boyd advised them that they should get Quality enrolled with Medicare and Medicaid. Broussard and Reece hired Boyd as a consultant and paid him $10,000 to assist them in transitioning Quality into a primarily Medicare/Medicaid clinic. Boyd's involvement with Quality was limited to this transition period.

Since Medicare and Medicaid would pay only for services billed by a physician, Reece and Broussard brought defendant-appellant Clemis Laraine Jackson, M.D. on board as Quality's Medical Director. Jackson's role was to perform a physical examination on each patient, diagnose the patient, and prescribe and oversee the patient's physical therapy.

Although it was unlawful to do so, Quality hired individuals

to recruit Medicare and Medicaid patients to the clinic and paid them $100 to $300 for each patient referral. These "marketers" targeted areas with a high concentration of elderly individuals. Reece testified that Boyd told him and Broussard of adult-day-care centers and elderly communities where potential patients could be found. In addition to using marketers, Quality paid its employees bonuses for patient referrals.

Quality also intentionally misdiagnosed patients in order to receive maximum payment from Medicare and Medicaid. Initially, the clinic diagnosed many patients with arthritis. But after Reece learned that Medicare did not pay as much for arthritis-related therapy since it was merely palliative, he asked Jackson to diagnose arthritic patients with conditions such as sprains and strains. Jackson complied, and the clinic reaped the benefit of higher Medicare payments.

The clinic also ignored Medicare and Medicaid's requirement of direct physician supervision. Medicare and Medicaid covers physical therapy only if it is performed under the direct supervision of a doctor. Although the therapy does not need to be performed in a doctor's immediate presence, Medicare and Medicaid cover it only if it is performed in the same suite while a doctor is present to assist if needed. But Quality billed Medicare and Medicaid for therapy performed while Dr. Jackson was not at the clinic, as well as for therapy provided in patients' homes and not in Dr. Jackson's presence. Reece testified that

-3-

Boyd told him the direct-supervision requirement was a gray area and that the clinic would not be investigated as long as it did not bill more than a certain amount.

Quality additionally billed Medicare and Medicaid for services that were never performed. This included billing for extra, unperformed therapy sessions as well as for extra, unperformed treatments within a therapy session.

At some point after Quality closed, Boyd approached Reece and Broussard, told them he was not doing well, and offered to sell them his Medicare and Medicaid provider numbers so that they could open a new clinic. Boyd, Reece, and Broussard partnered together to open the second clinic at issue in this case, Phycare Healthcare Systems ("Phycare"). Phycare's physician was Howard Grant, M.D. Many of Phycare's initial patients and employees came from Quality. Like Quality, Phycare employed marketers who were paid to recruit patients, and it paid its employees bonuses for patient referrals.

Initially, Boyd was not heavily involved in Phycare's day-to-day operations, which were primarily overseen by Reece. But after a short period, in April 1998, Boyd terminated the partnership, and Reece and Broussard were no longer associated with Phycare. After this occurred, Dr. Grant ran the day-to-day operations. Throughout this period, however, Boyd was the sole signatory on Phycare's bank account; Boyd wrote the employees' paychecks, and he endorsed and deposited the checks that came in

-4-

to Phycare.

After a dispute between Boyd and Dr. Grant,[1] Boyd severed their business ties. Boyd subsequently opened Houston Rehab with his mortuary-school classmate, Carl Brooks, in a different suite of the same building where Phycare was located.[2] Houston Rehab also employed the use of individuals to recruit patients to the clinic.

After an investigation involving both state and federal law-enforcement agencies into various physical-therapy clinics,[3] the grand jury handed down a 70-count indictment.[4] Count 1 charged that Boyd and Jackson, along with several other individuals, conspired together in violation of 18 U.S.C. § 371 to pay illegal remunerations (kickbacks), to commit health-care fraud, and to launder money. Counts 2 to 14 alleged various payments of

---

[1] The dispute centered around (1) money Dr. Grant believed Boyd owed him and (2) improper billing for Phycare patient Timothy Brown, which is discussed in detail in the section of the opinion pertaining to the sufficiency of the evidence.

[2] The government and Boyd dispute whether Houston Rehab was a new clinic separate from Phycare or rather the same clinic as Phycare but with a new name. This dispute is not important for the purposes of deciding this appeal.

[3] The investigation looked into many more clinics than the three mentioned here. We discuss solely Quality, Phycare, and Houston Rehab because they are the only clinics relevant to this appeal.

[4] Nine individuals, including Jackson, Boyd, Reece, and Broussard, were indicted. Pursuant to a plea agreement, Reece pleaded guilty and testified in this case. Jackson, Boyd, and Ronald A. Haley, M.D. proceeded to a jury trial. The jury acquitted Haley of all charges.

illegal remunerations in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).  Boyd was charged in counts 9 and 10 for two checks paid to Phycare employee Michelle Gordon, allegedly for patient referrals.  Counts 15 to 60 alleged health-care fraud in violation of 18 U.S.C. § 1347.  Boyd was charged in count 44 in connection with an allegedly fraudulent claim Phycare submitted to Medicare for patient Timothy Brown.[5]

The jury convicted Jackson and Boyd of the counts listed above.  Boyd and Jackson now appeal both their convictions and their sentences.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

Because Boyd preserved his challenge to the sufficiency of the evidence, we review de novo the district court's denial of his Rule 29 motion for a judgment of acquittal.  United States v. Anderson, 174 F.3d 515, 522 (5th Cir. 1999) (citing United States v. Payne, 99 F.3d 1273, 1278 (5th Cir. 1996)).

In reviewing the sufficiency of the evidence, we view the

---

[5] Boyd was also charged in counts 50, 51, 52, and 53 in connection with certain Medicare billing performed by Houston Rehab.  The district court granted Boyd's Rule 29 motion for a judgment of acquittal on these counts.

Additionally, Jackson was charged in counts 24 and 25, but the jury acquitted him of these charges.

Counts 61 to 70 alleged money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Neither Boyd nor Jackson was charged with money laundering.

evidence and the inferences drawn therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt.  Id. (citing United States v. Burton, 126 F.3d 666, 669 (5th Cir. 1997); Payne, 99 F.3d at 1278).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  Id. (quoting Burton, 126 F.3d at 669-70).  "Moreover, our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct." Id. (citing Burton, 126 F.3d at 670; United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir. 1993); United States v. Bell, 678 F.2d 547, 549 n.3 (Former 5th Cir. 1982)).

But "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."  United States v. Pettigrew, 77 F.3d 1500, 1521 (5th Cir. 1996) (citing United Stats v. Menesses, 962 F.2d 420, 427 (5th Cir. 1992)).  And "if the evidence, viewed in the light most favorable to the verdict, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction."  United States v. Salazar, 66 F.3d 723, 728 (5th Cir. 1995) (per curiam) (citing United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992)).

**B. Health-Care Fraud**

Boyd first challenges the sufficiency of the evidence for his conviction on count 44 of health-care fraud in violation of 18 U.S.C. § 1347.[6]  After carefully reviewing the trial testimony in the light most favorable to the government, we conclude that a rational jury could not have found that the government proved every element of count 44 beyond a reasonable doubt.

The indictment alleged in counts 15 to 60 that various defendants engaged in a scheme to fraudulently obtain money from Medicare and Medicaid by billing Medicare and Medicaid for therapy not covered, not ordered by a physician, not provided by qualified persons, and/or not provided at all.  Count 44 specifically charged Boyd with submitting a false claim to Medicare in the amount of $1,890.00 for services relating to Phycare patient Timothy Brown.

---

[6] Section 1347 makes it a crime to

> knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice——
>
> > (1) to defraud any health care benefit program; or
> >
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services.

Brown testified that he was referred to Phycare in April 1998. Dr. Grant evaluated Brown during his first visit, and Brown received treatment at Dr. Grant's office three times a week for several weeks. But in May or June of 1998, transportation issues caused Brown to stop going to Phycare for further treatment. After Brown stopped going to Phycare, however, he received several Medicare Explanation of Benefits statements indicating that Phycare had billed Medicare for treating Brown in June and July of 1998. Brown discussed these statements in person with Dr. Grant, and Dr. Grant explained that someone else was billing Medicare automatically and that the automatic billing had not been halted. Brown asked Dr. Grant for some money for bringing the matter to his attention, and Dr. Grant paid Brown $200 or $250 in cash. Brown also talked with Boyd by phone; Boyd told Brown that the money Medicare paid on the claims would be returned to Medicare.

Boyd does not dispute that Phycare continued to bill Medicare for treating Brown even after Brown had stopped going to Phycare. But Boyd contends that there is insufficient evidence he knowingly billed Medicare for these unperformed services. He argues that the evidence demonstrates the billing was being performed automatically and that the false claim was submitted because Brown stopped showing up for his appointments.

To establish that Boyd submitted the claim fraudulently, the government first points to evidence that Boyd owned Phycare, that

Boyd derived the most personal benefit from Phycare's operation, that Boyd was the sole signatory on Phycare's bank account, that Medicare paid Phycare $875.00 on the claim underlying count 44, and that Boyd endorsed and deposited the Medicare check in Phycare's account. But this evidence does nothing more than associate Boyd to some degree with the inaccurate claim; it does not establish Boyd's knowledge that the claim was inaccurate either when it was submitted to Medicare or when the check was received and deposited. Boyd's having deposited the Medicare check is equally as consistent with his purported belief in the claim's accuracy as it is with his alleged knowledge of its inaccuracy.

The government next contends that Boyd's conviction may be sustained because the false claim for Brown's therapy was submitted in the course of a broad scheme to defraud Medicare. At oral argument, the government opined that the only reason Phycare was opened was to defraud Medicare and Medicaid and that every claim Phycare submitted was therefore fraudulent. But as we explain below, the government failed to establish that Boyd's knowledge of and participation in a scheme to defraud Medicare extended to the practice of billing Medicare for therapy that was never performed.

We acknowledge that the government did establish Boyd's participation in certain untoward practices at Phycare. For example, Boyd participated in paying Phycare's employees bonuses

-10-

for referring patients. But there was no evidence that the individual who referred Brown to Phycare was paid a referral bonus. The government also established that Boyd condoned Reece and Broussard's practice at Quality of billing Medicare and Medicaid for therapy that was performed without direct physician supervision; Boyd told Reece, Broussard, and Jackson that this was a gray area and that Quality would not be investigated as long as it did not bill more than a certain amount. But the government did not establish that this practice occurred at Phycare.[7] Moreover, it is undisputed that Brown's therapy was performed in Phycare's office under the supervision of Dr. Grant. Thus, although the government established Boyd's participation in certain questionable, even unlawful, practices at Phycare, none of these practices was sufficient to sustain Boyd's conviction on count 44 because there was no evidence that these practices occurred with respect to Brown's therapy.

The only way the claim underlying count 44 could have been fraudulent is if it were submitted to Medicare with knowledge that the services were not performed. It thus would have been highly relevant to count 44 had the government established that Phycare routinely billed Medicare for services that were never performed. But apart from the claim for Brown's treatment, the

---

[7] Reece did testify that Phycare was "going to operate in the same manner that Quality . . . was operating," but beyond this broad statement, he did not testify that the direct-physician-supervision rule was being violated at Phycare.

government failed to present evidence that Phycare ever billed Medicare for extra, unperformed therapy. And although the government did establish that Quality routinely billed Medicare for unperformed services after Boyd's consultation services for Quality were completed, the government never linked Boyd to such billing at Quality. In sum, the government wholly failed to present evidence that Boyd engaged in a scheme to defraud Medicare by submitting claims for services that were never performed.

Furthermore, the government never presented any evidence refuting the innocent explanation its own witness provided for the inaccurate claims: that the billing had been set up to be done automatically and had simply not been stopped after Brown stopped coming in for therapy. For example, there is no evidence that Phycare continued to bill for Brown's unperformed treatments after Brown brought the situation to Boyd's attention. Moreover, the defense presented two letters that Boyd wrote to Dr. Grant in which Boyd chided Dr. Grant for paying Brown money and asked Dr. Grant for accurate documentation of the dates of Brown's treatment so that Boyd could determine how much to refund Medicare; Dr. Grant never provided this information. And soon after this incident, and in part because of this incident, Boyd severed his relationship with Dr. Grant.

We conclude that the jury's verdict on count 44 cannot

-12-

stand, and we reverse Boyd's conviction for health-care fraud.[8]

## C. Illegal Remunerations (Kickbacks)

Boyd was convicted of counts 9 and 10 for the payment of illegal remunerations (kickbacks) in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).[9] These counts concerned two checks in the amounts of $300 and $200, respectively, that Boyd wrote to Phycare employee Michelle Gordon allegedly for referring patients to the clinic.

Boyd challenges the sufficiency of the evidence for these counts. He does not dispute that he wrote the checks or that the checks, if they were in fact payments for patient referrals, were in connection with a federal health-care program. Instead, he asserts that there was insufficient evidence the checks were for patient referrals and that they instead could have been payroll checks.

---

[8] Because we reverse Boyd's conviction for count 44, we need not address Boyd's argument that the jury instructions pertaining to this count were erroneous.

[9] Under this provision,

> whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

42 U.S.C. § 1320a-7b(b)(2)(A).

-13-

Boyd relies primarily on the fact that Gordon changed her testimony at trial. During direct examination, Gordon testified that she received these checks as bonuses for referring patients to the clinic, but on cross examination she changed her testimony and said that she could not remember whether the particular checks were for patient referrals or for her salary.[10]

We conclude that despite Gordon's changed testimony, there was sufficient evidence that these two checks were payments for Gordon's patient referrals. Gordon testified that she referred up to 20 patients to Phycare, that she was paid by check for patient referrals, and that Boyd wrote all the checks she received from Phycare; Gordon never changed this part of her testimony. Moreover, the $300 check that was the basis for count 9 was notated "PR" in the memo line; although Boyd argued that "PR" stood for "payroll" rather than "patient referral," the jury was free to conclude otherwise in light of the other evidence. The government additionally presented evidence that Gordon's normal payroll checks were for more than $500 and were not in even amounts, and they were often notated "salary" or "salary + gas." Furthermore, the amounts of these particular checks were in line with the $100-to-$300 range that Reece testified his employees at Quality were paid for each referral.

---

[10] Ultimately, on redirect examination, Gordon testified that the check that was the basis for count 9 could have been for payroll or for patient referral: "[W]hichever way you-all want it to be. I don't know. I can't remember."

Based on this additional evidence, we conclude that a rational jury could have found beyond a reasonable doubt that Boyd wrote the particular checks in issue as payment for Gordon's referring Medicare or Medicaid patients to Phycare.

### III. JURY INSTRUCTIONS

**A. Standard of Review**

Because Boyd did not preserve his arguments by proffering the proper objections below, our review of the jury instructions is for plain error. See United States v. Fuchs, 467 F.3d 889, 901 (5th Cir. 2006) (citing United States v. Rubio, 321 F.3d 517, 523 (5th Cir. 2003)). Under this standard, we may reverse only if (1) there was error, (2) the error was clear and obvious, and (3) the error affected the defendant's substantial rights. See id. (quoting United States v. Garcia Abrego, 141 F.3d 142, 165 (5th Cir. 1998)); FED. R. CRIM. P. 52(b). "In determining whether a particular jury instruction was erroneous, we consider the jury charge as a whole." Russell v. Plano Bank & Trust, 130 F.3d 715, 721 (5th Cir. 1997) (reviewing for plain error) (citing Turnage v. Gen. Elec. Co., 953 F.2d 206, 211-12 (5th Cir. 1992)). Generally, to demonstrate that his substantial rights were affected, "the defendant must make a specific showing of prejudice." United States v. Olano, 507 U.S. 725, 735 (1993); see also United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003) ("A defendant's substantial rights are only affected if the

error 'affected the outcome of the district court proceedings.'"
(quoting Olano, 507 U.S. at 734)).  Even if these criteria are
satisfied, reversal is discretionary; we reverse only if we
conclude that "the error seriously affects the fairness,
integrity or public reputation of judicial proceedings."  Olano,
507 U.S. at 736 (quotation marks and brackets omitted) (quoting
United States v. Atkinson, 297 U.S. 157, 160 (1936)); Garcia
Abrego, 141 F.3d at 166.

**B. Illegal Remunerations (Kickbacks)**

Boyd contends that the jury instructions for counts 9 and 10
contained plain error because the jury was instructed that it
could convict him based on "any kickback" paid "to any person."
The portion of the jury instructions pertaining to these counts
described the first element of the crime of illegal remunerations
as, "offer[ing] or pa[ying] remuneration, including any kickback
or bribe, directly or indirectly, overtly or covertly, in cash or
in kind to any person."  Boyd argues that because there was
evidence that Boyd may have been involved with other kickback
payments, there was a substantial risk that the jury may have
convicted him on the basis of other purported kickbacks.

Viewing the jury charge as a whole, we conclude that the
instructions for counts 9 and 10 did not amount to plain error.
The district court instructed the jury that it was to "decide
whether the Government has proved beyond a reasonable doubt that

-16-

the defendants are guilty of the crimes charged.  The defendants are not on trial for any act, conduct, or offense not alleged in the indictment."  Furthermore, in the instructions pertaining to counts 9 and 10, the court explained that the indictment charged Boyd with making specific payments in the amounts of $300 and $200.  The court's instruction on the first element simply tracked substantially the language of 42 U.S.C. § 1320a-7b(b)(2).  Contrary to Boyd's argument, we believe the risk of juror confusion was low.  We conclude that Boyd has not demonstrated plain error that affected his substantial rights.

## C. Multiple Conspiracies

Boyd's contention that the district court committed plain error by not giving the jury a multiple-conspiracies instruction is baseless.  In the portion of the instructions pertaining to the conspiracy count, the court did include this circuit's pattern multiple-conspiracies instruction.[11]

---

[11] The court instructed the jury:

> Further, you must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it.  If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed.  If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

Cf. FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) § 2.21 (2001).

-17-

**D. Ex-Post-Facto Instruction**

Count 1 charged Boyd with conspiracy to commit health-care fraud, launder money, and pay illegal remunerations. With respect to conspiracy to commit health-care fraud, Boyd argues that the district court should have instructed the jury that it could consider only the conduct that occurred after the health-care-fraud statute took effect. The health-care-fraud statute, 18 U.S.C. § 1347, was enacted on August 21, 1996, but the indictment alleged in count 1 that the conspiracy began in or before January 1996. Boyd argues that if his conspiracy conviction was based on conduct occurring before the effective date of the health-care fraud statute, then his conviction violates the Ex Post Facto Clause, U.S. CONST. art. I, § 9, cl. 3.

As we stated above, we review for plain error. Assuming without deciding that the district court should have given a jury instruction regarding the effective date of the statute, Boyd must also demonstrate that his substantial rights were affected—i.e., he must show a reasonable probability that absent the error he would have been acquitted of the conspiracy charge. See Olano, 507 U.S. 725, 735.

Boyd has failed to show any affect on his substantial rights for two reasons. First, since conspiracy is a continuing offense, the jury could still have convicted Boyd of conspiracy to commit health-care fraud if it found that the conspiracy

-18-

continued after the effective date of the health-care-fraud statute.  See Garcia Abrego, 141 F.3d at 167.  Boyd has not demonstrated that the conspiracy ended before the health-care-fraud statute was enacted.

And second, the special verdict form demonstrates that the jury would have convicted Boyd of conspiracy even had the court given an instruction as to the effective date of the statute. The jury reported on a special verdict form that it unanimously found that Boyd had conspired to commit all three alleged purposes of the conspiracy (health-care fraud, money laundering, and payment of illegal remunerations).  The jury's finding as to any one of the three purposes is sufficient to support a conviction on count 1.  See, e.g., United States v. Calle, 120 F.3d 43, 45 (5th Cir. 1997) ("[A] general guilty verdict on a multiple-object conspiracy may stand even if the evidence is insufficient to sustain a conviction on one of the charged objects." (citing Griffin v. United States, 502 U.S. 46, 60 (1991))).  Since the jury found that Boyd also conspired to launder money and to pay illegal remunerations, the outcome at trial would have been the same absent the alleged error.

## IV. CONSTRUCTIVE AMENDMENT

Jackson asserts that the jury instructions constructively amended the indictment because they permitted the jury to convict him of conspiracy to commit health-care fraud on the basis of a

scheme to defraud Medicare and Medicaid of the intangible right of honest services, when the indictment charged only a scheme to defraud Medicare and Medicaid of money and property. Concluding that the error did not affect Jackson's substantial rights, we reject Jackson's argument that the error was reversible.

## A. Standard of Review

As Jackson acknowledges, our review is for plain error because Jackson did not properly object to the jury instructions below. See United States v. Bieganowski, 313 F.3d 264, 287 (5th Cir. 2002) (citing United States v. Delgado, 256 F.3d 264, 278 (5th Cir. 2001)).

## B. Discussion

"[T]he Fifth Amendment guarantees a criminal defendant that he will only be tried on the charges that have been alleged in an indictment handed down by a grand jury" and that the indictment will not "be broadened or altered except by the grand jury." United States v. Griffin, 324 F.3d 330, 355 (5th Cir. 2003) (internal quotation marks omitted) (quoting United States v. Arlen, 947 F.2d 139, 144 (5th Cir. 1991)). A constructive amendment of the indictment, in violation of these guarantees, "occurs when the trial court[,] through its instructions and facts it permits in evidence, allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment." Id. (internal

quotation marks omitted) (quoting Arlen, 947 F.2d at 144).

Jackson was charged in count 1 with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 by, inter alia, conspiring to commit health-care fraud as defined in 18 U.S.C. § 1347.[12] The indictment alleged that Jackson conspired to commit health-care fraud by agreeing to execute a scheme to fraudulently obtain money and property from Medicare and Medicaid; the indictment did not allege that Jackson agreed to execute a scheme to deprive the government of the intangible right to honest services.

In the jury instructions relating to count 1, the district court enumerated the elements of both conspiracy and health-care fraud. The court instructed the jury that an element of health-care fraud was a scheme or artifice to defraud a health-care benefit program, but the instructions did not at this point define "scheme to defraud." Seven pages later, however, in the portion of the instructions relating to the substantive health-care-fraud counts, the instructions defined "scheme to defraud" as including "any scheme to deprive another of money, property, or of the intangible right to honest services by means of false

_____

[12] Count 1 also charged that Jackson violated § 371 by conspiring to commit money laundering and to pay illegal kickbacks. On a special verdict form, the jury reported that it unanimously agreed that Jackson conspired to commit health-care fraud; only six of the twelve members agreed that Jackson conspired to commit money laundering; and only one member found that Jackson conspired to pay illegal kickbacks.

-21-

or fraudulent pretenses, representations, or promises." 1 R. 215 (emphasis added).

Jackson contends that the district court's inclusion of "intangible right to honest services" in the jury instructions' definition of "scheme to defraud" constituted a constructive amendment of the indictment since it was not charged in the indictment. He argues that his conviction must be reversed because the jury was permitted to convict him of conspiracy on a basis not charged in the indictment.

The government conceded at oral argument that "intangible right to honest services" should not have been included in the jury instructions. But the government contests Jackson's position that the conviction should be reversed, arguing that Jackson has not demonstrated that the error affected his substantial rights.

Jackson argues that his substantial rights were affected because the jury could have found that he engaged in a scheme to deprive Medicare and Medicaid of the intangible right to honest services.[13] But under the third prong of plain-error review, it is Jackson's burden to demonstrate a substantial probability that absent the error the outcome at trial would have been different. Hence, it is not enough that the jury could have convicted

---

[13] Although Jackson's services were provided directly to the patients, the jury could have found that they were provided indirectly to the Medicare and Medicaid programs since these programs were paying for the patients' treatment.

Jackson based on the "honest services" language; Jackson must also demonstrate a reasonable possibility that the jury would have acquitted him had only the "money and property" language been included in the instructions. Jackson has failed in this regard. The government's theory was that Jackson engaged in a scheme to defraud Medicare and Medicaid through false billing. Jackson has not articulated any rational basis on which the jury——once it accepted the government's theory, as it ostensibly did——could have found that the purpose of the scheme was to deprive Medicare and Medicaid of the right to honest services and not also to deprive them of money and property.

United States v. Griffin, on which Jackson relies heavily, is distinguishable. The panel in that case, reviewing for plain error, vacated the defendants' mail-fraud convictions because of a constructive amendment of the indictment. Griffin, 324 F.3d at 355-56. As in this case, the jury instructions in Griffin defined "scheme or artifice to defraud" as including a scheme "to deprive another of the intangible right to honest services," even though the indictment charged only a scheme to obtain money and property. Id. at 353. The difference between Griffin and this case is that in Griffin the object of the scheme was to obtain unissued tax credits, which the panel held was not money or property as those terms were used in the mail-fraud statute. See id. at 352-55. The only possible basis for the convictions was therefore under the "honest services" language, which did not

-23-

appear in the indictment.  Unlike in Griffin, the evidence in this case of Jackson's involvement in a scheme to fraudulently bill Medicare and Medicaid supports a conviction under the "money and property" language that was charged in the indictment.

Jackson's reliance on United States v. Adams is also misplaced since the standard of review in that case was not for plain error as it is here.  See 778 F.2d 1117, 1120 (5th Cir. 1985) (noting that the defendant objected below).  This distinction is crucial because when there is a constructive amendment that was properly objected to before the trial court, the conviction must be vacated regardless of any showing of prejudice.  Griffin, 324 F.3d at 355 (quoting United States v. Mikolajczyk, 137 F.3d 237, 243 (5th Cir. 1998)).  But where, as here, the defendant fails to raise the error below, the defendant carries the heavy burden of demonstrating that the error affected his substantial rights.  See id. at 355-56; Olano, 507 U.S. at 734.

Instead, this case is most analogous to United States v. Dixon, 273 F.3d 636 (5th Cir. 2001).  In Dixon, the defendant was charged with kidnapping for the purpose of committing aggravated sexual abuse.  Id. at 637.  But the trial judge instructed the jury that to convict it needed to find that the defendant held the victim for "some benefit," which could have included either sexual gratification or financial gain, even though financial gain was not charged in the indictment.  Id. at 638-39.  The jury

-24-

convicted the defendant of kidnapping.  Id. at 638.  Reviewing the jury instructions for plain error, the Dixon panel concluded that the defendant had not demonstrated any effect on his substantial rights.  Id. at 640.  The panel recalled evidence of the victim's sexual activity during the kidnapping and reasoned that the jury must have found that the defendant had sexually assaulted the victim.  Id.  Given the "overwhelming evidence that the 'benefit' [the] defendant derived from the kidnapping was aggravated sexual abuse, as specifically charged in the indictment," the panel affirmed the conviction.  Id.

Based on the evidence in this case, the jury could not have convicted Jackson based on the "honest services" language without also finding that the purpose of the scheme was to deprive Medicare and Medicaid of money and property.  Consequently, we conclude that the inclusion of "intangible right to honest services" in the jury instructions did not affect Jackson's substantial rights, and we decline to reverse his conspiracy conviction on this basis.

## V. INTERFERENCE WITH A WITNESS

Jackson asserts that the government substantially interfered with its own witness Kim Boutte's right to testify, violating Jackson's constitutional right to present a defense.  We disagree that the government's conduct affected Jackson's rights.

The government subpoenaed Boutte, who had been a secretary

at Houston Rehab and who had not worked with Jackson, to testify at trial.  Boutte moved to quash the subpoena, asserting her Fifth Amendment privilege against self-incrimination.  At a hearing, Boutte alleged that a statement she had given the government implicating four defendants was partially false and that she had produced the statement only in response to pressure from the government.  She also averred that when she brought this to the attention of a government lawyer, the lawyer threatened her.  Moreover, she told the court that there was not any testimony she could give at trial that would not tend to incriminate her.  The court gave defense counsel an opportunity to question Boutte, but Jackson's counsel declined.  The court then granted Boutte's motion and released her.

Jackson argues for the first time on appeal that Boutte's testimony would have benefitted him and that the government's interference thus violated his right to present a defense. Because Jackson did not preserve his arguments below, we review for plain error, even though Jackson's arguments pertain to alleged constitutional violations.  See United States v. Knowles, 29 F.3d 947, 951 (5th Cir. 1994) ("[A]lleged constitutional errors in criminal convictions—that do not amount to plain error—are forever forfeited by the failure to object contemporaneously to that error in the district court.").

"The Sixth Amendment guarantees a criminal defendant the right to present witnesses to 'establish his defense without fear

-26-

of retaliation against the witness by the government.'" Bieganowski, 313 F.3d at 291 (quoting United States v. Dupre, 117 F.3d 810, 823 (5th Cir. 1997)). "In addition, the Fifth Amendment protects the defendant from improper governmental interference with his defense. Thus, 'substantial governmental interference with a defense witness'[s] choice to testify may violate the due process rights of the defendant.'" Id. (quoting Dupre, 117 F.3d at 823).

Jackson contends that the government's interference with Boutte's free and unhampered choice to testify violated his Fifth and Sixth Amendment rights to present a defense. He asserts that Boutte's testimony would have been exculpatory to at least some defendants and that any exculpatory evidence would have had some impact on the government's case against him on the conspiracy count.

But Jackson has not demonstrated that the government interfered with his ability to present his own defense because Boutte was a government witness, not Jackson's witness. Jackson acknowledges this problem and attempts to overcome it by arguing that Boutte was a de facto defense witness. He asserts that we may assume Boutte's trial testimony would not have benefitted the government since it would have been contrary to her previous statement implicating certain defendants. But even accepting this assumption arguendo, Jackson has not alleged that he would have called Boutte to testify for him absent the government's

interference, nor has he made any specific showing of prejudice beyond his conclusory allegation that Boutte's testimony would somehow have hurt the government's case generally. Jackson has thus failed to demonstrate plain error that affected his substantial rights.

**VI. SENTENCING ISSUES**

**A. Boyd's Sentence**

Because we reverse Boyd's conviction on count 44, we also vacate his sentence and remand for resentencing. We nonetheless address here Boyd's arguments about alleged sentencing error.

**1. Booker Error**

Relying on Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, 543 U.S. 220 (2005), Boyd contends that the district court erred by enhancing his sentence based on facts not found by the jury beyond a reasonable doubt. He argues that the district court should have granted his motion for a new trial to give the jury an opportunity to make factual findings for sentencing.

Booker error occurs when the sentencing judge bound by mandatory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") increases the Guidelines sentencing range based on facts not found by the jury or admitted by the defendant. United States v. Mares, 402 F.3d 511, 518 (5th Cir.), cert. denied, 126 S. Ct. 43 (2005). But under Booker, "with the mandatory use of

the Guidelines excised, . . . [t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline[s] sentencing range." Id. at 519. Boyd was sentenced under the post-Booker advisory Guidelines system, and the record indicates that the district judge was aware of the Guidelines' advisory nature. There was therefore no Booker error in Boyd's sentencing.

## 2. Mass-Marketing Enhancement

Boyd also contends that the district court's application of a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(ii) for the use of mass marketing was improper.

Since Boyd objected to the enhancement below, we review the district court's factual findings for clear error and its interpretation and application of the Guidelines de novo. United States v. Angeles-Mendoza, 407 F.3d 742, 746-47 (5th Cir. 2005). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." United States v. Holmes, 406 F.3d 337, 363 (5th Cir.) (quoting United States v. Powers, 168 F.3d 741, 752 (5th Cir. 1999)), cert. denied, 126 S. Ct. 375 (2005).

U.S.S.G. § 2B1.1(b)(2)(A)(ii) provides for a two-level enhancement if the offense was committed through mass marketing. The commentary to the Guidelines defines "mass marketing" as "a plan, program, promotion, or campaign that is conducted through

solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit."  U.S.S.G. § 2B1.1 cmt. n.4(A).

Boyd argues here, as he did below, that the mass-marketing enhancement encompasses only techniques of modern mass communication, such as billboards, radio, television, the Internet, newspaper, and bulk mail.  He posits that the application of the enhancement in this case was improper because the marketing primarily involved personal, face-to-face recruiting of patients, not channels of mass communication.

But the definition of "mass marketing" is not limited to the mass-communication channels listed in the commentary.  Instead, the commentary "explicitly contemplates 'other means' of mass-marketing."  United States v. Magnuson, 307 F.3d 333, 335 (5th Cir. 2002) (per curiam).  Section 2B1.1(b)(2)(A)(ii) "merely requires advertising that reaches 'a large number of persons.'" Id. (quoting United States v. Pirello, 255 F.3d 728, 731 (9th Cir. 2001)).

Based on the following evidence, we discern no clear error in the district court's implicit finding that the face-to-face marketing in this case was intended to reach a large number of persons.  First, as part of his consulting services to Quality, Boyd taught Reece and Broussard how to use marketers to find elderly patients, and Boyd suggested areas where such patients

could be found, such as adult day-care centers and elderly communities. Second, Gordon testified that Boyd paid her for recruiting up to 20 patients to Phycare. And third, part of Houston Rehab's business involved recruiting patients to the clinic, and the clinic had at least one person recruiting full time. Furthermore, Boyd does not dispute that the marketing methods were intended to reach and did in fact reach a large number of persons.

Accordingly, we conclude that the district court did not err in applying a two-level enhancement for the use of mass marketing.

## B. Jackson's Sentence

The district court calculated Jackson's Guidelines base offense level at 24 and imposed a 3-level enhancement for his managerial role in the offense and a 2-level enhancement for violating a position of trust, resulting in a total offense level of 29. Factoring in Jackson's Category III criminal history, the court arrived at a Guidelines range of 108 to 135 months' imprisonment. But the court sentenced Jackson to 60 months' imprisonment, the statutory maximum for a conspiracy conviction under 18 U.S.C. § 371.

Jackson maintains that his sentence should be vacated because of Booker error. Since he failed to properly object below, we review Jackson's sentence for plain error. See Mares,

402 F.3d at 520.  As the government concedes, Jackson satisfies the first two prongs of plain-error review: there was error because he was sentenced under a mandatory scheme, and the error is plain under Booker.  See id. at 520-21.  The question therefore is whether Jackson has demonstrated that his substantial rights were affected.  To make such a showing, Jackson must demonstrate that under an advisory system, the district court would have imposed a significantly different sentence, i.e., a sentence of less than 60 months' imprisonment. See id. at 521.

Jackson first argues that the Booker error affected his substantial rights because the district judge's own factual findings caused his Guidelines range to be increased from 2-8 months to 108-135 months.  But Booker error does not occur simply because the district judge enhances a sentence based upon her own factual findings; rather, Booker error occurs "when the sentencing judge bound by mandatory Guidelines increase[s] the sentencing range under the Guidelines based on facts not found by the jury or admitted by the defendant."  Id. at 518 (emphasis added).  Hence, it is not enough that Jackson has demonstrated that the district judge's own factual findings resulted in a higher sentence; he must also demonstrate a sufficient probability—sufficient enough to undermine confidence in the outcome—that his sentence would have been lower under an advisory, rather than mandatory, system.  See id. at 521.

-32-

Jackson next argues that the district court would have imposed a lesser sentence under an advisory scheme. Jackson points to the district judge's remarks during the sentencing proceeding wherein she stated that she lacked any discretion over the sentence to be imposed. Jackson also notes that the district court imposed the lowest possible sentence under the mandatory scheme. After reviewing the transcript of the sentencing proceedings, however, we are not persuaded that the district judge would have imposed a sentence below 60 months' imprisonment under an advisory Guidelines system. The district judge's comment that she lacked discretion with regard to Jackson's sentence referred simply to the fact that there was no range of possible sentences from which she could select since the low end of the Guidelines range (108 months) exceeded the 60-month statutory maximum. Furthermore, Jackson has not even attempted to demonstrate that a sentence of less than 60 months, which would have varied from the 108-month Guidelines minimum by more than 48 months, would have been reasonable.[14]

---

[14] Jackson also makes the following arguments solely to preserve them: (1) that application of the plain-error standard is inappropriate in this case because it would have been futile for him to object to the mandatory nature of the Guidelines prior to Blakely; (2) that under Bouie v. City of Columbia, 378 U.S. 347 (1964), and Marks v. United States, 430 U.S. 188, 196-97 & n.13 (1977), and their progeny, due process forbids the retroactive application of Booker's remedial holding to him; (3) that Mares misapplies the plain-error standard of United States v. Dominquez Benitez, 542 U.S. 74 (2004); and (4) that he is not required to show prejudice because the error was structural since it affected the entire framework of the sentencing proceedings in

-33-

## VII. CONCLUSION

For the foregoing reasons, Jackson's convictions and sentence are AFFIRMED; Boyd's convictions on counts 1 (conspiracy) and counts 9 and 10 (illegal remunerations) are AFFIRMED; Boyd's conviction on count 44 (health-care fraud) is REVERSED; and Boyd's sentence is VACATED and the case REMANDED for resentencing.

---

this case. As Jackson recognizes, these arguments are foreclosed by this court's precedents.