United States Court of Appeals
Fifth Circuit

**F I L E D**

June 14, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 05-51333

UNITED STATES OF AMERICA

Plaintiff - Appellee

VERSUS

PAUL ADAMS RUSH

Defendant - Appellant

Appeal from the United States District Court
For the Western District of Texas, Austin Division
1:05-CR-00032

Before HIGGINBOTHAM, DAVIS and WIENER, Circuit Judges.

PER CURIAM:[*]

The Defendant-Appellant, Paul Adams Rush, was indicted and convicted on two counts of wire fraud, in violation of 18 U.S.C. § 1343; two counts of bank fraud, in violation of 18 U.S.C. § 1344; eight counts of making false statements related to a loan, in violation of 18 U.S.C. § 1014; and five counts of money laundering,

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

in violation of 18 U.S.C. § 1957.  Rush challenges the sufficiency of the evidence to sustain his convictions for wire fraud and money laundering and appeals his sentence of 120 months imprisonment on each of the seventeen counts.  For the reasons set forth below, we AFFIRM.

I.  Factual Background and Procedural History

Paul Adams Rush ("Rush") was charged in a seventeen-count indictment with wire fraud, bank fraud, making false statements related to a loan, and money laundering.  The charges against Rush involved two separate schemes, both concerning a company founded by Rush, Audiobooks of Texas, Inc. dba Earful of Books, Inc. ("Earful").  Rush was the President and Chief Executive Officer of Earful, as well as the company's largest single shareholder.  At the time, Earful was experiencing great financial difficulties.

The first scheme involved Rush's dealings as trustee of a trust, and form the basis of the wire fraud and money laundering counts.  In March 1999, Vera and Stewart Bowen (the "Bowens") established a trust fund for the benefit of their four children (the "Bowen Trust").  After becoming acquainted with Rush through church activities and naming Rush as the godfather of one of their children, the Bowens asked Rush to serve as the trustee of the trust, and Rush accepted.  The trust was created to purchase $12,000,000 of life insurance and was fully funded with an advance deposit of $575,000.  Northwestern Mutual Life Insurance Company

2

("Northwestern Mutual") became the repository of the cash and assets related to the Bowen Trust.

In January 2001, Rush contacted Steven Saunders ("Saunders"), the Bowens' estate-planning attorney who drafted the trust instrument, and Michael Steward ("Steward"), who was previously employed by Northwestern Mutual and assisted the Bowens in creating the insurance policy for the trust, and falsely maintained that the Bowens wanted to borrow money from the trust fund as a "bridge loan" to purchase a new home. Saunders advised Rush that it was not a good idea, but that it was allowed under the provisions of the trust if the loan was, inter alia, properly secured with collateral.

Rush expressed to Steward a sense of urgency in obtaining the loan, as the Bowens needed money quickly to purchase their new house, and, believing Rush to be the Bowens' representative, Steward assisted Rush in completing the necessary loan documents. On February 2, 2001, the first wire transfer of $499,985 from Northwestern Mutual took place. Approximately 30 days later, Rush applied for another loan from the policy of $29,000. Again, Rush expressed to Steward a sense of urgency in obtaining the money. As a result, on March 5, 2001, a second wire transfer of $29,000 from the same Northwestern Mutual account took place.

Steward testified that, for months, Rush maintained that when the Bowens sold their house in Austin, the proceeds from the sale

3

would be used to dramatically reduce, if not eliminate, the debt to the policy.  However, no payments were ever made on the loan, and, according to Steward, the Northwest Mutual life insurance policy was in jeopardy.  As a result, Steward suggested to Rush that the Bowens replace the current insurance policy with another carrier and refinance the loan, which would require updated physical examinations of the Bowens.  Steward informed Rush that time was critical because the coverage was going to terminate due to the exhaustion of the policy.  Nevertheless, although Rush indicated numerous times that the Bowens would be taking - and Mr. Bowen had taken  - the requisite physicals, Rush never provided the medical examinations and the loans were never refinanced.

Instead of using the money to finance the purchase of a house for the Bowens, Rush used the borrowed money to pay down debt in Earful, which was experiencing increasing cash-flow and financial difficulties.  In fact, at no time did the Bowens ever tell Rush that they needed a "bridge loan" to finance the purchase of their house[1] and they did not learn what happened until after the loans were made, and the money spent.

The second scheme involved efforts by Rush to secure loans on behalf of Earful and form the basis of the bank fraud and making false statements counts.  Beginning in 2001, Rush obtained several

---

[1]The Bowens financed the down payment for the purchase of their new house with a loan from Vera Bowen's parents.

4

loans from City National Bank and Village Bank and Trust on behalf of Earful.  Rush submitted numerous documents purportedly signed by Russell Grigsby ("Grigsby"), a member of the Board of Directors of Earful, to renew and guarantee the loans.  However, Grigsby neither signed nor authorized loan documentation related to the subject loans.  Instead, Rush forged Grigsby's signature and directed his assistant, Judy Nodecker ("Nodecker"), to notarize the signatures and certify that she witnessed the signatures.

Rush was convicted by a jury on all seventeen counts.  The district court subsequently sentenced Rush to 120 months imprisonment on each of the seventeen counts, to be served concurrently.[2]

On appeal, Rush claims that the evidence was insufficient to establish wire fraud and money laundering and that the district court erred in imposing his sentence.[3]

## II.  Sufficiency of the Evidence

We first address whether the evidence was sufficient to sustain Rush's convictions for wire fraud and money laundering.

We examine the sufficiency of the evidence to determine "whether, viewing all the evidence in the light most favorable to

---

[2]Rush was also sentenced to five years of supervised release on each of counts one through twelve, and three years of supervised release on each of counts thirteen through seventeen, all to be served concurrently.  Restitution of $1,669,813.61 was ordered and a special assessment of $1,700 was imposed.

[3]Rush does not challenge his convictions for bank fraud and making false statements related to a loan.  Rush does, however, challenge his sentence for those convictions.

the verdict, a rational trier of fact could have found that the evidence establishes the essential elements of the offense beyond a reasonable doubt."[4]  "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."[5]

## A.  Wire Fraud

We begin by considering the sufficiency of the evidence supporting the charges of wire fraud.  The elements of wire fraud, under 18 U.S.C. § 1343, are (1) "a scheme to defraud;" and (2) "the use of, or causing the use of, wire communications in furtherance of that scheme."[6]  Critical to a showing of a scheme to defraud is proof that the defendant possessed a fraudulent intent.[7] Fraudulent intent can be shown by proving that the defendant contemplated or intended some harm to the property rights of his victims.[8]

Rush argues that the evidence was insufficient to establish

---

[4]United States v. Villarreal, 324 F.3d 319, 322 (5th Cir. 2003).

[5]United States v. Stephens, 964 F.2d 424, 427 (5th Cir. 1992).

[6]United States v. Odiodio, 244 F.3d 398, 402 (5th Cir. 2001).

[7]See United States v. St. Gelais, 952 F.2d 90, 95 (5th Cir. 1992).

[8]See United States v. Stouffer, 986 F.2d 916, 922 (5th Cir. 1993) (citing St. Gelais, 952 F.2d at 95).

6

that he intended to deprive the Bowen Trust of money because the money was only a "loan" to Earful that he intended to repay. We disagree.

There is ample evidence that Rush had the requisite fraudulent intent when he wired the money from the Northwestern Mutual account. As Rush concedes, he made several false statements in connection with the loans from the Bowen Trust and misrepresented the purpose of the loans. A jury could have reasonably construed these lies as an attempt by Rush to hide illegal activities. In addition, Rush used the money to pay down the debt of Earful, which was in grave financial condition. Earful had been unprofitable since its inception and by 2001 had an accumulated deficit of over $9.5 million.[9] Testimony indicated that Earful was in need of cash and was unable to pay its bills. Moreover, Rush depleted virtually all of the funds in the Bowen Trust. As a result, the insurance policy "was effectively cannibalizing itself," eliminating any cash value. Rush was notified that the insurance policy was about to be terminated and that the Bowens needed to take out another policy to refinance the loans. However, contrary to Rush's false assurances that the necessary steps were being taken to refinance the loans, a new insurance policy was never executed and, thus, the loan was not refinanced. Lastly, although

[9]Earful had a net loss of $1,109,202 and an accumulated deficit of $2,560,746 in 1999; a net loss of $2,554,883 and an accumulated deficit of $5,115,462 in 2000; and a net loss of $4,596,061 and an accumulated deficit of $9,711,523 in 2001.

7

Rush had the authority to borrow money from the trust fund, under the terms of the trust instrument, Rush was obligated to manage the funds in a "prudent way."[10] Rush's action in taking virtually all of the assets of the trust and placing the funds into a financially failing company was far from prudent.[11] A jury could have reasonably interpreted Rush's actions against his fiduciary duty and the interests of the beneficiaries as evidence of an intent to defraud.

The jury was entitled to reject Rush's characterization of the funds he took from the trust as "loans" to Earful that he intended to repay. No collateral was ever provided for the purported loans and no payments were ever made. In addition, the money was spent in one week and was largely used to pay delinquent bills and to fund prior overdrafts. As a result, the funds did not produce any new prosperity for the unprofitable company which could be used to repay the alleged loan.[12] A jury could have reasonably concluded that, at the time of the wire transfers, the funds would be wasted

---

[10]In addition, in a letter to Rush outlining his duties and responsibilities as trustee, Rush was notified that if the funds were borrowed, they had to be prudently invested. The letter to Rush defined "prudence" as, inter alia, preservation of capital, including not making speculative investments, and a reasonable return in terms of income.

[11]In the same above-mentioned letter, Rush was also informed that, as part of his duty of loyalty to the beneficiaries, he was to "exclude from consideration [his] own personal interests . . . .," and, under the Texas code, a trustee generally cannot engage in self-dealing.

[12]Although Earful was seeking to sell assets and obtain investment capital, Grigsby discovered that Rush's leads to sell some assets were "totally fabricated."

on a doomed enterprise and not repaid.

Viewing the evidence in the light most favorable to the verdict, we conclude that a jury could have found beyond a reasonable doubt that Rush possessed an intent to defraud. The evidence amply supports the wire fraud convictions.

### B. Money Laundering

Rush appeals his money laundering convictions on sufficiency of the evidence grounds, arguing that the evidence was insufficient to establish the underlying specified unlawful activity of wire fraud.

The money laundering statute, 18 U.S.C. § 1957, requires a financial transaction involving the proceeds of a specified unlawful activity, which includes wire fraud.[13] Rush's five money laundering convictions were based on the specified unlawful activity of wire fraud. The wire frauds alleged in the money laundering counts are the same as those in the wire fraud counts. Therefore, for the reasons previously stated, the money laundering convictions are affirmed.

### III. Sentencing

Rush disputes the district court's application of the Guidelines and claims that his sentence is unreasonable.

The district court calculated the guideline range to be 87 to

---

[13]See 18 U.S.C. § 1961(1).

108 months.[14] However, after determining the Guideline range, the district court decided that an upward variance was justified and imposed a non-Guideline sentence[15] of 120 months imprisonment on each count, to be served concurrently.

In determining the Guideline range, counts one through twelve ("group one") were grouped together and counts thirteen through seventeen ("group two") were grouped together.[16] Since group one included conduct that was treated in the guidelines applications of group two, the groups were closely related and the highest offense level was used.[17] Group one produced the highest offense level, 28.

The base offense level for group one was six.[18] Because the fraud involved more than $1,000,000, which was derived from one or more financial institutions, a total of eighteen points was added,[19]

---

[14]Although the 2004 guidelines were in effect at the time of sentencing, the probation officer used the 2001 Guidelines Manual when preparing the presentence report ("PSR"), having determined that the latter was more advantageous to Rush.

[15]We use the term "non-Guideline" sentence to distinguish it from a Guideline sentence which includes a sentence that has been adjusted by applying a "departure" as allowed by the Guidelines. United States v. Mares, 402 F.3d 511, 519 n.7 (5th Cir. 2005). Contrary to Rush's assertion, the sentence imposed by the district court did not involve an "upward departure." In imposing the 120-month sentence, the court made no reference to upwardly departing and specifically stated that it was granting a variance pursuant to 18 U.S.C. § 3553(a). See United States v. Smith, 440 F.3d 704, 708 n.3 (5th Cir. 2006).

[16]U.S.S.G. § 3D1.2.

[17]U.S.S.G. § 3D1.3.

[18]U.S.S.G. § 2B1.1(a).

[19]Sixteen points were added pursuant to U.S.S.G. § 2B1.1(b)(1)(I) and two points pursuant to U.S.S.G. § 2B1.1(b)(12)(A).

bringing Rush's offense level up to 24. The court then added a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) for Rush's role as an "organizer, leader, manager or supervisor," and a two-level enhancement pursuant to U.S.S.G. § 3B1.3 because Rush abused a position of trust. In light of Rush's criminal history score of II, his sentence range was 87 to 108 months.

The district court calculated the offense level for group two to be 27. In arriving at this figure, the court determined that the base offense level was 24 because the offense level from which the laundered funds were derived resulted in an offense level of 24 since the fraud involved over $1,000,000 derived from one or more financial institutions.[20] Because Rush was convicted under 18 U.S.C. § 1957, one level was added, pursuant to U.S.S.G. § 2S1.1(b)(2)(A). In addition, a two-level enhancement was added because Rush abused a position of trust.[21] Consequently, group two's total offense level of 27 was lower than that of group one.

Rush argues that the district court erred in imposing his sentence by (1) increasing group one by two points pursuant to U.S.S.G. § 3B1.1(c) for being a supervisor in a criminal activity; (2) increasing group two by two points pursuant to U.S.S.G. § 3B1.3 for abusing a position of trust; (3) calculating the guideline range for money laundering using the total amounts involved in the

---

[20]U.S.S.G. § 2S1.1(a)(1).

[21]U.S.S.G. § 3B1.3.

11

fraud prosecutions; and (4) imposing a sentence above the Guideline range.

We review the district court's findings of fact for clear error and its application of the Guidelines de novo.[22] Under <u>United States v. Booker</u>,[23] we ultimately review a sentence for "unreasonableness" with regard to the statutory sentencing factors enumerated in 18 U.S.C. § 3553(a).[24]

Before imposing a non-Guideline sentence, a district court must consider the Sentencing Guidelines.[25] This consideration

---

[22]<u>Smith</u>, 440 F.3d at 706 (citation omitted).

[23]543 U.S. 220 (2005).

[24]<u>Id.</u> at 261. The relevant factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed ... medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for-
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
(5) any pertinent policy statement ...;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

18 U.S.C. § 3553(a).

[25]<u>Smith</u>, 440 F.3d at 707.

requires that the court calculate the appropriate Guideline range.[26]

## A.    The Guideline Range

Rush first argues that the district court erred in imposing a two-level leadership enhancement to group one because Nodecker was not a "participant."[27]  We agree.

"To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other <u>participants</u>."[28]  A "participant" is defined as a person who, although not necessarily convicted, "is criminally responsible for the commission of <u>the</u> <u>offense</u>."[29]

The district court overruled Rush's objection to the two-point enhancement, stating

> It's clear from the evidence I heard in the trial that Mr. Rush was responsible for leading his trusted employee . . . to commit criminal offenses by notarizing signatures when she didn't have them executed in her presence, not knowing, I'm sure, they were forged.[30]

The group to which the leadership enhancement was applied involved the charges for wire fraud, bank fraud, and making false

---

[26]<u>Id.</u> at 707.

[27]U.S.S.G. § 3B1.1(c).

[28]U.S.S.G. § 3B1.1(c), comment n.2 (emphasis added).

[29]U.S.S.G. § 3B1.1, comment, n.1 (emphasis added).

[30]In response to Rush's objections to the PSR, the government argued that Nodecker did not see Grigsby sign the loan documents and thus, when she notarized that she had witnessed the signatures of Grigsby, Nodecker made a false oath and could be prosecuted under Tex. Penal Code Ann. § 37.02.  However, this was not an offense for which Rush was charged.

13

statements related to a loan. On appeal, the government maintains that Nodecker was a criminally responsible participant in the false statements offenses because she falsely asserted that she witnessed Grigsby's signatures on the loan documents when she knew that it was important to banks that she actually witness such signatures. Even assuming that Nodecker's actions would constitute a violation of 18 U.S.C. § 1014, the false statements relevant to Rush's offenses were that Grigsby had actually signed the subject documents. As recognized by the district court, Nodecker was not aware that Grigsby's signatures were forged. Accordingly, Nodecker was not a "participant" in the offense.

As a result, we conclude that the district court erred in increasing the offense level for group one by two levels pursuant to U.S.S.G. § 3B1.1(c).[31] Without this error, the adjusted offense level for group one would have been 26. Since group two had an adjusted offense level of 27, it would have produced the highest offense level.

Having determined that the district court made an error in an application of the Guidelines, we need not decide whether the district court committed further errors in calculating the guideline range because such errors do not change the disposition

---

[31]See United States v. McCoy, 242 F.3d 399, 410 (D.C. Cir. 2001); United States v. Gross, 26 F.3d 552, 554 & n.5 (5th Cir. 1994).

of this case.[32]

## B. Reasonableness

Generally, if the district court makes an error in an application of the Guidelines, we vacate the resulting sentence without reaching the sentence's ultimate reasonableness.[33] This is so because <u>Booker</u> did not invalidate 18 U.S.C. § 3742(f), which provides:

> If the court of appeals determines that . . . the sentence was imposed in violation of law or imposed as a <u>result of</u> an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings . . . .[34]

However, a non-Guideline sentence that did not directly "result" from the Guidelines error need not be vacated based solely on the miscalculation.[35] Nevertheless, "a miscalculation of the guideline range deprives the sentence of great deference and is a factor to be considered in assessing the reasonableness of the sentence."[36]

---

[32]We note that if we were to adopt the calculations as suggested by Rush in his brief, his adjusted offense level would be 27, only one level lower than that calculated by the district court. This results in a guideline range of 79 to 97 months.

[33]United States v. Duhon, 440 F.3d 711, 716 (5th Cir. 2006) (citing United States v. Villegas, 404 F.3d 355, 362 (5th Cir. 2005)).

[34]18 U.S.C. § 3742(f) (emphasis added).

[35]Duhon, 440 F.3d at 716.

[36]United States v. Medina-Argueta, 454 F.3d 479, 483 (5th Cir. 2006) (citation and internal quotations omitted).

15

In imposing the non-Guideline sentence in this case, the district court stated that, "notwithstanding any objection, this court would not give you a sentence less than 120 months under any circumstances." Rush's sentence did not "result" from an incorrect application of the Guidelines and, therefore, the district court's miscalculation of the Guideline range does not require reversal under 18 U.S.C. § 3742(f)(1).[37] "Formalism does not require us to vacate [Rush's] sentence so that the district court on remand, will simply impose the exact same sentence . . . ."[38] We therefore proceed to review Rush's sentence for reasonableness.

Our reasonableness review in non-guideline cases begins with the requirement in <u>Mares</u> that the district court justify a non-guideline sentence with "fact specific reasons involving aggravating circumstances, personal characteristics of the defendant, his offense conduct, criminal history, or other conduct specific to the case at hand."[39] Here, the district court justified its sentence, in part, as follows:

> I'm going to grant a variance in this case pursuant to 18 United States Code 3553(a). One of the reasons is your own personal characteristic of having no remorse for your action and no conscience trying to rectify the evil that

---

[37]<u>Duhon</u>, 440 F.3d at 716 (involving statement by district court that it would have imposed the same non-guideline sentence regardless of the Guideline range); <u>see</u> <u>Medina-Arqueta</u>, 454 F.3d at 483 n.2 (noting that the district court stated that, in its view, any lower sentence would be inappropriate).

[38]<u>See</u> <u>Medina-Arqueta</u>, 454 F.3d at 483 n.2.

[39]<u>Mares</u>, 402 F.3d at 519.

16

you've done through restitution and through paying your bills. You've just got a history of stealing and stealing big. Time in the penitentiary from the Frost stealing didn't even slow you down when you accomplished this criminal conduct as we've indicated you owe still a half a million dollars to Frost, as well as being indebted to the Internal Revenue Service. And the evidence is undisputed in this case, you took advantage of friends, fellow church members, and even those persons who asked you to be a godfather to children, you stole money from all of them. You even stole money on projects that was to protect the same children that you accepted religious responsibility for . . . . [Y]ou also impaired and damaged the lives of more than 50 employees [and many investors]. . . . The Court was taken with the evidence when you placed Ms. Nodecker in a position where she could actually go to jail having her notarize what you knew to be forged signatures. The Court finds you're really truly a scoundrel without a conscience. You're a serious threat to the public, and your sentence for this type of conduct must be a deterrent.

By providing these reasons, the district court satisfied the requirement in <u>Mares</u> that it enumerate the factors on which its sentence is based so the appellate court can conduct a reasonableness review.

However, Rush's sentence is not <u>per</u> <u>se</u> reasonable merely because the district court articulated its justification for the sentence as <u>Mares</u> requires. Our inquiry turns now to whether the court's proffered justification for the 120-month sentence is sufficient to withstand our reasonableness review. In reviewing for reasonableness, we assess whether the statutory sentencing factors support the sentence.[40] A non-Guideline sentence is unreasonable where it "(1) does not account for a factor that

---

[40]<u>Smith</u>, 440 F.3d at 707.

17

should have received significant weight; (2) gives significant weight to an irrelevant or improper factor; or (3) represents a clear error of judgment in balancing the sentencing factors."[41]

The district court justified the sentence with specific reference to the language of § 3553(a). The district court considered the nature and circumstances of the offense and the history and characteristics of Rush to be particularly reprehensible in light of Rush's lack of remorse and his relationship to his victims.[42] The court's statements also reflect a concern for the seriousness of the offense and the need to provide just punishment pursuant to § 3553(a)(2)(A). In addition, the court specifically addressed the need to afford adequate deterrence to criminal conduct and to protect the public from further crimes of Rush, as outlined in § 3553(a)(2)(B) and (C).

Rush maintains the court improperly placed significant weight on his lack of remorse and 1990 conviction for embezzlement. In addition, Rush contends that his actions in taking advantage of his friends, fellow church members, and co-workers were already accounted for in the guidelines by the leadership enhancement and the enhancement for abusing a position of trust. We conclude that the district court properly considered these factors in imposing the 120-month sentence.

_____

[41]Id. at 707-08.

[42]See 18 U.S.C. § 3553(a)(1).

Although Rush's 1990 embezzlement conviction was used to calculate his criminal history, this calculation did not take into account Rush's failure to make any effort to remedy the harm he caused or the specific characteristics of that offense. Moreover, in stressing Rush's lack of remorse, the district court also cited his failure to repay the Internal Revenue Service, the Bowens, and the subject banks. In addition, the abuse of a position of trust enhancement focused on Rush's status as trustee of the Bowen Trust. The enhancement did not take into consideration other instances in which Rush took advantage of his friends and fellow church members. Similarly, the leadership enhancement only involved Rush's direction of Nodecker. Therefore, Rush's actions impairing the lives of other co-employees and investors were not considered.[43]

Viewing the district court's justification in light of all the § 3553(a) factors, we conclude that Rush's sentence is not unreasonable. The factors considered by the district court are all relevant, proper factors. We see no other factors relating to Rush that should have received significant weight and find no errors of

---

[43]Rush also argues that the district court did not use the proper procedure in imposing his sentence because it did not examine each successive criminal history category to determine whether it was adequate before imposing an upward departure. See United States v. Lambert, 984 F.2d 658, 662-63 (5th Cir. 1993). Because the district court imposed a non-Guideline sentence in this case and not an upward departure pursuant to U.S.S.G. § 4A1.3, the court was not required to consider each intermediate criminal history category before arriving at its sentence. See Smith, 440 F.3d at 708 n.3 (where the district court does not make reference to upwardly departing, "we do not examine whether an upward departure . . . was available under the Guidelines"); see also, United States v. Armendariz, 451 F.3d 352, 358 n.5 (5th Cir. 2006) (citing id.).

19

judgment in the district court's balancing of the sentencing factors. Accordingly, we affirm Rush's sentence.

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.